IN RE ESTATE OF ELLA D. NEWSON.

ANNA TWEED, Appellee, v. S. G. FRINK, Executor, Appellant.

MAY 15, 1928.

REHEARING DENIED SEPTEMBER 28, 1928.

*J. C. France,* for appellant.

*Donnelly & Lynch* and *C. O. Boling,* for appellee.

MORLING, J.—Decedent was a maiden lady, apparently of advanced years, who had been living alone in a large house, and looking after her real property, the extent and character of which do not appear. Claimant, an unmarried English woman, then 30 years old, a dressmaker, came to the United States, got acquainted with decedent, and commenced working for her late in 1913. Claimant testifies, in substance, that the house contained 17 rooms, besides porches, halls, closets, large basement, and attic; that decedent occasionally had visitors, and entertained. Claimant says that she (claimant) did all of the work, house cleaning and window cleaning, cooking, laundry, furnace work, and handled 16 to 20 tons of coal during the winter; that she did the garden work, canning, and sewing, and also nursed decedent in her illnesses, of which there were a number. Claimant says she accompanied decedent to social affairs, and did the work for her entertaining at home, in all of which she had little help. The testimony also tends to show that claimant was a companion to decedent, and served her in the capacities named to the time of her death. There were no other

occupants of the house, except a 9-year-old niece of claimant's, who came there from England November 6, 1923, was received into the home as a member of the family, and became known as Mary Louise Newson. Claimant says that she took entire care of the child, and made her clothing. There is evidence tending to show that claimant assisted in looking after decedent's property to some extent, including the collection of rents and paying them to decedent. Claimant received, the first year, $16 a month, and after that, $20 a month to February 1, 1925. The executor allowed claimant $220 for services from February 1, 1925, to date of decedent's death. On November 17, 1924, decedent made to the order of claimant, and claimant indorsed, a check for $88.25, bearing on its face, "in full to December 1, 1924." Claimant says that part of this check was for groceries that she paid for in cash. There is testimony that plaintiff's services were worth $100 per month. A copy of a will by decedent, dated January 4, 1923, contains this item:

"I give, devise and bequeath in the event only that she survives me and remain with me unto Anna Tweed, an English woman who has lived with me for many years, the sum of $5,000."

In her filed claim (so far as material), claimant sets out her employment by decedent and the work she performed, and says that, after she entered decedent's employ, decedent orally agreed with her that, if she would remain with decedent and render services of the character related until decedent's death, in addition to the sums paid from time to time to apply on compensation, decedent would provide for claimant sufficient additional amount to liberally and fairly compensate claimant for all such services, and decedent agreed to make out of her estate such provision for claimant as would make claimant financially independent. Claimant alleges that decedent did execute a will providing for a legacy of $5,000, and exhibited to her a copy of it, and that, in addition, decedent assured claimant that claimant would receive real estate of value sufficient, with the $5,000 and the sums paid, to give claimant such fair and liberal compensation. Claimant alleges that she relied upon such assurances and upon the will, and by reason thereof continued in decedent's employ, receiving only a small part of the reasonable value of

518

her services; that, in violation of her agreement, decedent executed another will, making no provision for claimant, which has been admitted to probate. Claimant alleges that the reasonable value of her services in excess of the sums received is at least $9,281.61, and that, if decedent had performed her agreement, claimant would have received at least that amount.

The executor's principal contentions are that evidence is insufficient to show the existence of any agreement for compensation other than that which has been paid and allowed; that the evidence shows that claimant has been allowed full compensation; that claimant was incompetent as a witness to testify to conversations which she claims to have overheard between decedent and others, particularly with Mr. Cook; and that her testimony thereto should not have been received.

I. It is agreement to, and mutual understanding of, the existence of an obligation assumed by one of the parties to the other, that, for the purpose of the point now about to be considered, is the essential element of a contract. Usually agreement is arrived at by means of a proposal or offer, express or implied, from one side, expressly or impliedly accepted on the other. But formality in proposing and accepting is not required. There must be an intention to assume legal liability, as distinguished from a mere ebullition of emotion or expression of intention to do an act of generosity. A promissory expression without intention to contract is not sufficient. 1 Page on Contracts (1st Ed.), Section 22 *et seq.*; 13 Corpus Juris 263 *et seq.*; 6 Ruling Case Law 585 *et seq.* The existence of the mutual understanding, the proposal and acceptance, may be implied from conduct and circumstances. These may be shown by circumstantial evidence, or by the admission of the party to be charged. *Ball v. James,* 176 Iowa 647, 655; *Hankins v. Young,* 174 Iowa 383, 392; *Spicer v. Administrator of Estate of Spicer,* 201 Iowa 99, 101; *Ridler v. Ridler,* 93 Iowa 347; 13 Corpus Juris 767, 768; *Franklin v. Tuckerman,* 68 Iowa 572.

Acceptance may be shown by conduct or by performance communicated to the promisor. *Franklin v. Tuckerman,* 68 Iowa 572; *Hankins v. Young,* 174 Iowa 383, 392; 6 Ruling Case Law 587, 605.

The existence of a contract by which claimant was receiving a weekly or monthly wage is not inconsistent with an agree-

ment by which she might be entitled to receive larger or more adequate compensation if she continued in decedent's employment, performing desired services, during decedent's life. The two agreements were not inconsistent or mutually destructive. The one would not contradict the other. The two would be distinct and independent, one collateral to the other. *Dixon v. Lamson,* 242 Mass. 129 (136 N. E. 346).

Mr. Cook, who was pastor of decedent's church from 1911 to 1914, testifies that he was called by Miss Newson:

"Q. Did she say anything to you with reference to Anna, joining the church? A. She did. That is the reason she sent for me. Q. State whether or not you had a conversation with Miss Newson when Anna was present at any time. A. I had before Anna was present, and then after she was present. * * * Somewheres in 1914. * * * Miss Newson called me to come over there, telling me that she had this English girl that she was taking into her home, to be one with her, and she was anxious that I should see about getting her church letter from England from the Episcopalian church there, and to explain any difference between the Methodist church and the Episcopalian church. She told me that she was taking Anna into her home as to be one with her, and that she was going to adopt her right into the home, was going to take care of her in every particular. * * * She introduced Anna to me, and told me that: 'Here is my girl, that I have taken into my home to be my girl. I am going to take care of her all her life, and take her into the home, she says; that is the reason I want her in the church. I am having her in my home to be one with me, and I am going to make ample provision for Anna when I am gone. * * * She said she was there as her companion."

Mr. Cook testifies, on cross-examination:

"Q. Did she say she was paying her $16 a month at that time? A. No, sir. Q. She didn't say anything about that? A. Yes, she said she was giving Anna pin money. Q. She said she was going to care for her? A. For her financially,—O, that she was going to stay with her, and she was going to make ample provision for her; she would never want for anything afterwards. * * * Q. What she talked to you about was getting Miss Tweed

transferred from the Episcopal church to your church? A. It was, but she had the reason back of it.''

Mrs. Britcher testifies that, about nine years before the trial (which was in September, 1926) :

''I asked Miss Newson, or said to her, 'You have Anna with you yet,—still have her with you;' and she said, 'Oh, yes, she will always be with me, and she will be well rewarded for it.' ''

On cross-examination, this witness testifies that Miss Newson ''said she was always to stay with her, and she would be well taken care of.''

Mrs. Patterson testifies, on cross-examination:

''Q. Now you said within the last couple of years she said that Anna—that people said she was not giving Anna enough money? A. Yes. Q. Did she tell you how much she was giving her then? A. No, sir, she said she was giving her what she was giving her for spending money.''

This witness testifies that, about 1921, Miss Newson ''said she was very tired, and I said, 'What have you been doing, that you are tired?' She said she had been out to the farm, where she was fixing up a schoolhouse on the 120 acres which, she said, 'I intend Anna to have some day.' * * * She just said that Anna had always been good to her, and she thought she deserved that. * * * In the last couple of years, she has often told us how good Anna was to her; she always thought, she said, people had said she wasn't giving her enough money, but she said it would all be right in the end. * * * She had said she gave Anna that little house in the north part of town.''

Another witness, Mrs. Escher, testifies:

''She told me, if Anna stayed with her as long as she lived, Anna * * * would never need to work any more; that she would be provided for when her death was, if she stayed that long. * * * She said Anna was her company, her maid and everything; that she was just like her own child to her; that they was just fine together, and she couldn't see why her and Anna couldn't get along, and she would provide for Anna when she was done with it.''

Another witness, Mrs. Bleesdale, testifies:

"She said she wasn't going to donate anything for the church; that what money she had she was going to give to those who had given to her. I said, 'Well, you don't have any of your own relatives;' and she said, 'No, I don't have any relatives that I consider relatives;' but she said, 'Anna is with me, as you know;' she says, 'She is really the only companion I have had in all these years;' she said, 'What I have to give,' she said, 'I am going to give to those that have given to me.' * * * She told me that there was a lady friend of hers that had mentioned the fact that she would pay her $8 a week. I said to her, 'What inducement would $8 a week be to Anna to leave me and go to work for $8 a week?' * * * I said, 'Well, what did Anna think about it?' A. She said she wouldn't consider it at all. She said, 'I never told Anna, because $8 a week would never do; she would never get anything out of $8 a week in any way, shape, or form like what I expect to do for her.' I said, 'What have you done for her?' She said, 'I have made arrangements so Anna will never have to work again,' she said. I said, 'Are you sure that you have got that fixed?' She said, 'Yes, I have got it all fixed.' * * * She said, 'Anna has got to the age where she knows that she can never marry and have what she will have if she stays with me.' "

Other witnesses testified to similar statements on the part of deceased.

Claimant testifies to hearing the talk with Mrs. Patterson and other witnesses, and to taking no part in the conversations. Claimant testifies to a conversation between decedent and Mr. Munn, in which claimant says she took no part, and in which decedent said that she didn't know what she would do without claimant; " 'but anyhow, I will see she is well provided for, provided she stays with me,' she said, 'I will see she is well provided for for all she does for me.' "

There is sufficient competent evidence to show communication by decedent to claimant of the alleged promises.

That the services were worth much more than the monthly payments to claimant is but feebly contested in evidence. On cross-examination, claimant was asked:

"You thought you would receive wages during the time?
A. Not wages; she never called it wages. It was part pay."

Claimant was not a relative of, or under any legal or moral obligation to, decedent. She was a young woman; she had a trade; she was unmarried; she gave about twelve of her best years to decedent's service for inadequate pay,—years in which she might otherwise reasonably hope to contract a marriage and acquire a home, or to acquire a business and competency. Decedent apparently had no ties binding her to others, or others to her. No reason for offering or receiving the services in question gratuitously, in whole or in part, appears. No sufficient reason for claimant's remaining with decedent and doing the work which she undisputedly did (for inadequate pay, if such), is suggested, other than decedent's agreement to provide at her death for adequate and liberal compensation in one of the methods suggested.

From the competent testimony and the circumstances, a jury would be authorized to find that it was decedent's wish, communicated to claimant, that claimant should stay with her during her lifetime and continue the services in which claimant was engaged; that claimant should stand in the relation of a companion to decedent,—a member of her home, and not a mere servant; that the sums that were being paid to claimant were understood not to be in full compensation, but were pin money, or spending money, for the time being; that, provided claimant would stay with decedent during her lifetime, and continue in the performance of the services in which claimant was engaged, decedent would make provision sufficient for claimant's care for claimant's lifetime, and such that claimant would not have to work for others after decedent's death; that decedent made these declarations, not merely as expressions of gratitude, or of good will, or of a generous purpose, but out of a sense of obligation, and with the knowledge that they might reasonably be received and accepted by claimant as obligations, and with the purpose that they should be so accepted; that decedent had made at least tentative arrangements, by means of the will and through the pieces of real property, to perform her promises; and not only that, but that she had in fact "made ar-

rangements [as she believed and as claimant understood] so Anna will never have to work again."

Otherwise expressed, the declarations and admissions of decedent and the circumstances shown in evidence authorized the jury to find that decedent asked claimant to come into her home, to be her companion, and to perform the services which she had performed, or was performing, and thereafter performed; that decedent accepted such services; that it was not expected by either party that the services were to be gratuitous, either in whole or in part; that it was not understood that the monthly payments were to be in full payment; that decedent, on condition that claimant should remain with her as long as she lived, would make for her ample provision; that it was understood that such provision should at least equal the value of the services, and that claimant should be paid thereby in the total a sum amounting at least to such value; that claimant, relying upon the agreement, fully rendered the services requested, but has not received the value of services rendered; that, for some reason other than the fault of claimant, decedent changed her arrangements and broke her agreement. The evidence would authorize the jury to find that decedent understood that claimant had accepted her offer; that claimant did in fact, and in reliance upon decedent's promises, make full performance upon her part, to decedent's knowledge. The jury might, therefore, find the existence of the contract alleged. Cases above cited. *Robinson v. Raynor*, 28 N. Y. 494. Decedent's breach of such agreement entitled the claimant to recover upon the *quantum meruit*. Her damages are the reasonable value of her services, less what she has received. *Hankins v. Young*; 174 Iowa 383; *Succession of Palmer*, 137 La. 190 (68 So. 405); *Loper v. Estate of Sheldon*, 120 Wis. 26 (97 N. W. 524); *Martin v. Estate of Martin*, 108 Wis. 284 (84 N. W. 439). If not expressly agreed, it was implied that the provision to be made by will should be at least adequate to compensate claimant for the reasonable value of her services. Idem; *Schmetzer v. Broegler*, 92 N. J. Law 88 (105 Atl. 450).

Technical accuracy and fullness of allegation or that degree of particularity of pleading and conformity of pleading to

 proof required in ordinary actions are not to be expected, and are not required, of claims filed against estates. *Newell v. Estate of Newell,* 198 Iowa 710; *Craig v. Estate of Craig,* 167 Iowa 340; 24 Corpus Juris 348.

II. The executor argues that the indorsed check is binding as a settlement. The indorsed check (paid) is no more than a receipt in full. It was subject to explanation, and even contradiction. *Mounce v. Kurtz,* 101 Iowa 192; 22 Corpus Juris 1140. As has been seen, even an agreement for monthly wages is not contradictory of the alleged collateral agreement to pay adequate compensation for remaining with decedent and continuing the services during her lifetime. Unless claimant continued to decedent's death, the agreement for further compensation would not come into operation. The oral agreement and the receipt were not contradictory. *Dixon v. Lamson,* 242 Mass. 129 (136 N. E. 346).

III. The executor urges that the alleged agreement must be proven by clear, satisfactory, and convincing evidence. The case is not in equity, and not triable here *de novo.* It is at law, was tried to a jury, and the question was for the jury to determine, upon the preponderance of the evidence. *In re Estate of Dolmage,* 204 Iowa 231.

IV. Claimant testified to overhearing a conversation between Mr. Cook and decedent, substantially as testified to by Mr. Cook, but further:

"She told Mr. Cook that I had promised to stay with her * * * and that, 'Provided she does,' she said, 'I will see she is well cared for in the end.' * * * "

Claimant testified that she did not take part in this conversation; and it was on that statement, and in response to questions in which she was asked to state the substance of the conversations in which she took no part, that the court received her testimony. In one of her answers on examination by her counsel, claimant testified:

"Mr. Cook came to the house, and she called me in to meet

him and visit with him; then she began to tell that she was so pleased that she had me; that I was a companion to her, and I had promised to stay with her, and said, 'Anna said that she will stay with me.' ''.

On cross-examination, claimant testifies:

"Miss Newson wanted me to give up my denomination and join hers, and I did. Q. She was talking to you about that during this time, was she? A. Yes. Q. You talked about staying there with her, did you? A. Yes."

After this, the executor moved to strike out claimant's testimony as to the conversation with Cook, on the ground that it then appeared that the statements were made in a conversation in which the three of them were taking part, and that the witness was incompetent, under Section 11257, Code of 1924. This was overruled. The motion should have been sustained. *Hart v. Hart*, 181 Iowa 527; *Secor v. Siver*, 188 Iowa 1126, 1131; *Crist v. Tallman*, 190 Iowa 1248. What claimant intended to say doubtless was that she did not take part in such of the conversation between decedent and Mr. Cook as immediately related to her personal affairs with decedent. But it appears that claimant was a party to the conversation. The communication had special reference to claimant, particularly the desire of decedent and the minister, then expressed to claimant, that claimant should change her church affiliations, and that desire was occasioned by the relationship, existing or prospective, between claimant and deceased, then talked about. Substantially, claimant's testimony was to a personal transaction and communication between her and deceased, and her testimony should have been excluded. *Tebbs v. Jarvis*, 139 Iowa 428; *In re Estate of Runnells*, 203 Iowa 144. We are of the opinion that claimant's testimony to this conversation is more than merely cumulative, particularly that in which claimant says that decedent told Mr. Cook that she had promised to stay with her. This testimony cannot be said to be without prejudice.

We think the other conversations to which claimant testified are shown to have been conversations between decedent and others, to which claimant was not a party, and that her testimony to them properly remained in the record, under the authorities above cited.

V. The executor complains of the admission of claimant's testimony to reading the $5,000 item of the will referred to, upon the ground that the exhibit was held in decedent's hands at the time that claimant read it. The testimony that claimant read that paragraph is not testimony to a personal transaction or communication, within the prohibition of the statute. Objection is also made to copies of letters written by decedent, expressing her regard for claimant. The copies are in the handwriting of the decedent, are her own statements, and were admissible, as showing her mental attitude toward claimant.

VI. The court excluded the executor's offer of the stub of the check for $88.25, on which stub was written, "Services in full to December 1, 1924." It is not shown that claimant had anything to do with the writing of this stub or knowledge of it. It does not add to the force of the check, and its rejection was without prejudice.

VII. The executor also urges that the court erred in permitting claimant to testify that she relied upon the conversations between testatrix and the third parties which she overheard, and relied upon the $5,000 provision in the will. She should not have been permitted to testify to reliance upon the statements which she was improperly permitted to testify were made in the conversations with Mr. Cook. She should not, on this record, be permitted to testify by indirection to statements to which she would not be permitted to directly testify. As has been seen, claimant was competent to testify to conversations which she overheard, and in which she took no part. If decedent had been living, claimant's testimony that she relied upon decedent's promises would have been competent. *Farmers' Nat. Bank v. Hatcher*, 176 Iowa 259, 264. Such testimony is in the nature of an opinion, but it is also of her own mental state. Idem; 22 Corpus Juris 610. Decedent's death made claimant incompetent to testify only to "personal transaction or communication" between claimant and decedent. Code of 1927, Section 11257. Claimant's state of mind and her knowledge were not a personal transaction or communication, and she was not incompetent to testify thereto. *In re Estate of Maurer*, 199

Iowa 899; *In re Estate of Townsend*, 122 Iowa 246, 252; *Tucker v. Anderson*, 172 Iowa 277, 293.

VIII. One of the instructions is objected to because it does not adequately advise the jury with reference to the payments or the settlement to February 1, 1925. It is not objected that the instruction was incorrect as far as it went. If the executor desired more elaborate instruction on the subject, he should have requested it.

We have sufficiently discussed the twenty-one errors assigned by the executor, and find no other prejudicial error.

IX. Claimant moved for the allowance of interest on the amount of the verdict from testatrix's death. As the judgment must be reversed on the executor's appeal, it is unnecessary to discuss claimant's assignment of error. We may say, however, that, on the record, the ruling of the court in this respect was not erroneous. For the error in admitting the claimant's testimony to the conversation between herself, decedent, and the witness Cook, and her reliance thereon, the judgment is— *Reversed.*

DE GRAFF, ALBERT, and WAGNER, JJ., concur.

STEVENS, C. J., concurs in result.