In re Estate of Joseph Karr.

William K. Karr et al., Appellees, v. William K. Karr, Administrator with will annexed, et al., Defendants; Elmer E. Simpson et al., Resistants, Appellants.

No. 46606.

December 12, 1944.

Lane & Waterman, of Davenport, and C. D. Marshall, of Rock Island, Illinois, for appellants.

Talbott & Talbott, of Brooklyn, and H. E. deReus, of Knoxville, for appellees.

BLISS, J.— ■ The deceased, Joseph Karr, seventy-eight, of Brooklyn, Poweshiek County, Iowa, died there April 16, 1943. He had never married. His older brother Ira, also a bachelor, seven years his senior, a resident of Rock Island, Illinois, died in 1932. His eldest sister, Rebecca (Karr) Simpson, died in the latter part of 1928. Her only survivor when Joseph died was her son, Elmer E. Simpson, one of the resistants. The other sister of Joseph, also his senior, was Mary (Karr) Humphrey, who preceded him in death some years, leaving as her only survivors when Joseph died her children, William Humphrey, Ira Humphrey, Olive Humphrey, Ruth Humphrey, and the following children of deceased daughters, to wit, Stella Mae Frenzel, Dorothy Marie Butterfield, Edgar Leroy Benway, Grace Olive Prentice, Ruth Elizabeth Penley, and Adolph Duvivier. These children and grandchildren comprise the remaining resistants. The only other surviving heir of the deceased Joseph is his brother William K. Karr, three years his junior, who is one of the three plaintiff appellees. The other two are Thomas Karr and Marjorie Smith, children of William K. Karr. Adella Karr and Katherine Schoonover, wife and daughter, respectively, of William K. Karr, are among the defendants.

On April 29, 1943, William K. Karr, on his own petition, was appointed and qualified as administrator of the intestate estate of Joseph Karr. On August 7, 1943, he filed his preliminary inheritance-tax report, inventory of property, list of heirs— the survivors of decedent's deceased sisters noted above, and himself—and under the heading "Beneficiaries Under Contract" he listed himself and his three children named above. No real estate was listed. The inventory showed cash in the bank of $4,077.93, about five thousand shares of stock of a market value of $127,150.24, and bonds of a market value of $14,224.20, making the total value of the estate $145,452.37.

On September 11, 1943, the claim of the plaintiffs, verified

by William K. Karr, against himself as administrator, was filed. It alleged that he and the deceased came to Brooklyn in 1889 and for fifty-four years operated a dry-goods store until Joseph's death, under the name of "Karr Bros.," and during the first forty years their brother Ira was an inactive partner; in 1894 William married and for forty-nine years Joseph lived in the home and with the family of William and his wife, Adella; "during the period of time from the date of the death of Ira Karr in the year 1932 to July 31, 1940, a mutual arrangement, compact and understanding was made and reached between Joseph and William whereby it was mutually agreed: (a) that Joseph would devise and bequeath $5000 to Thomas Karr, $5000 to Katherine Schoonover, $5000 to Marjorie Smith, and the balance of his estate to William: and (b) that William would devise and bequeath $5000 to Thomas Karr, $5000 to Katherine Schoonover, $5000 to Marjorie Smith, $200 to each of his grandchildren, and the balance of his estate to Adella Karr his wife"; in 1937, under said mutual contract, Joseph and William each advanced to Marjorie Smith one half of $5,500 to purchase her a home; after July 31, 1940, and preceding the death of Joseph, $10,000 was given to Katherine Schoonover to purchase a home as an advancement or ademption "under said existing mutual * * * contract," etc.; the estate of deceased consists entirely of personal property and is of a gross value of about $140,000; "under and in connection with said mutual arrangement, compact, understanding and contract, without the aid of legal counsel or assistance Joseph in ink and in his own handwriting wrote on two sheets of paper. That Exhibit 'A', attached hereto and by this reference made a part hereof, is a copy of one of said sheets of paper * * *. That on or about the 31st day of July, 1940, said paper [Exhibit A], and the other said sheet of paper [Exhibit B], entirely in the ink handwriting of Joseph Karr having blank spaces [for the name of the executor and for the signer] were submitted to William by Joseph and after considering the same William K. Karr wrote the words 'Joseph Karr' in the blank space [for the name of the executor] and the words 'Wm. K. Karr' [in the blank for the signer] * * * the said instruments identified herein as Exhibits 'A' and 'B' are testamentary in character and were executed under and in connection with said

mutual arrangement, compact, and understanding and contract between Joseph and William, but the instrument, identified as Exhibit 'A' does not meet all the formal requirements of section 11852 of the Code and by reason thereof it is not admissible to probate as the Last Will and Testament of Joseph Karr, deceased. That by reason of said facts, Joseph Karr failed to validly devise and bequeath his property in accordance with said mutual arrangement, compact and contract and Thomas Karr has been materially damaged in the sum of $5000, Marjorie Smith has been materially damaged in the sum of $2250, and William K. Karr has been materially damaged in an amount equal to the balance of the estate of said decedent, which is alleged to have, and be of, the value of $130,000,'' for which respective amounts the said persons hold claims against the estate and property of the deceased and ask allowance thereof.

The instrument Exhibit A, referred to in the claim, is as follows:

"I, Joseph Karr now residing at Brooklyn County of Poweshiek and State of Iowa being of sound mind & memory do hereby make publish and declare this to [be] my last will and testament hereby revoking any and all former wills by me at any time made

First    I direct that all just debts and funeral expenses shall be paid by Executor, hereinafter named as soon as same can be conveniently done

Second    I give, devise and bequeath to my brother William K. Karr all of my estate except the following

A I give devise and bequeath to my nephew Thomas Karr now residing at Carrizozo—New Mexico the sum of Five Thousand dollars—3½ 1/3 34

B I give devise and bequeath to my niece Katherine Schoonover now residing at Route 2 Baileys Cross Roads Alexandria Virginia the sum of Five Thousand dollars (5000.00)    34

C I give devise and bequeath to my niece Marjorie Smith now residing at 2815-46th St Des Moines Iowa the sum of Twenty two hundred fifty dollars 1/3 31250
She previously has—received—Twenty Twenty Seven hundred & fifty dollars—1/3 Less 2750—''

The instrument is just as set out above. It is written in ink except the figures following Paragraphs A and B and the two sentences in Paragraph C, which are in lead pencil. It bears no signature.

The instrument Exhibit B, referred to in the claim, is as follows:

"I, William K. Karr now residing at Brooklyn County of Poweshiek and State of Iowa—being of sound mind & memory do hereby make—Publish and declare this to be my last will and testament hereby revoking any and all former wills by me at any time made—

First    I direct that just debts and funeral expenses shall be paid by my executor herein after named as soon as same can be conveniently done

Second    I give, devise and bequest to my wife, Adella Karr as follows vis My residence and all the household contents The Storeroom building on Jackson St Brooklyn Iowa My one half interest in Karr Bros Dry Goods stock accounts and etc. in Brooklyn Iowa
Also the balance of my Estate after the following bequests Vis—(A—B—C)

A    I give devise & bequeath to my son Thomas Karr now residing in Carrizozo—New Mexico—The sum of Five Thousand dollars

B    I give devise & bequeath to my daughter Katherine Schoonover now residing at Route 2 Baileys Cross Roads Alexandria Virginia the sum of ($5000.00) Five Thousand dollars.

C    I give devise & bequeath to my daughter Marjorie Smith now residing at 2815-46th Des Moines Iowa the sum of Twenty two hundred fifty dollars She having had ($2750.00) previous

D    I give—devise & bequeath to each of my grandchildren the sum of Two hundred dollars—

Third    I hereby nominate and appoint *Joseph Karr* now residing at Brooklyn Iowa to be Executor of this my last will and testament and request that he be permitted to act as said Executor without bond.
In Witness Whereof I here onto set my hand and Seal

this 31st day of July A D—1940 at Brooklyn Iowa Poweshiek Co. *Wm. K. Karr.*" (Italics are ours.)

On September 11, 1943, U. M. Reed, attorney, of Brooklyn, Iowa, was appointed temporary administrator to pass on plaintiffs' claim, after notice given to all heirs of Joseph Karr. The notice was given but the record does not disclose that the temporary administrator ever passed upon the claim.

On September 18, 1943, Adella Karr filed petition to probate "the now discovered will of Joseph Karr." This will was admitted to probate on October 5, 1943, and on October 9th William K. Karr was appointed and qualified as administrator with the will annexed of the estate of deceased. And on the same day the claim of plaintiffs was refiled.

This will of Joseph Karr, duly executed and witnessed on May 26, 1928, gave and bequeathed his property as follows: to his brother Ira, $35,000; to his brother William K. Karr, $35,000; to his sister Rebecca Simpson, $3,000; to his sister Mary Humphrey, $5,000; to his niece, Elizabeth Duvivier, $2,000; to his nephew, Thomas Karr, his niece Katherine Karr, his niece Marjorie Karr, and his sister-in-law, Della Karr, all of Poweshiek County, Iowa, each $10,000. The testator's brother Ira Karr was nominated executor without bond.

On November 13, 1943, the heirs of the legatees Rebecca Simpson, Mary Humphrey, Elizabeth Duvivier, and Ira Karr (not including William K. Karr, heir of Ira Karr), each of whom had predeceased the testator, entered their appearances as resistants to plaintiffs' claim, denying its validity and praying for its disallowance.

On January 15, 1944, plaintiffs filed a second amendment to their amended claim, alleging in substance: Paragraph 13, that William K. Karr entered upon the performance of "said mutual arrangement, compact, understanding and contract between Joseph Karr and William K. Karr"; paragraph 14, "that William K. Karr has been and is now ready, willing and able to perform his covenants and at the time of his death will complete **performance of his covenants in accordance with and under said** mutual arrangement, compact, understanding and contract; that by reason of the facts set out in this claim as amended, the

administrator of the estate of Joseph Karr, deceased holds the assets of said estate in trust for the benefit of these claimants." Plaintiffs then pray:

"Wherefore William K. Karr, Thomas Karr and Marjorie Smith renew their respective claims as heretofore set out and by way of equitable relief pray and ask that said claims as allowed be established and impressed as a trust upon the property and assets of the estate of Joseph Karr, deceased, subject only to the just debts and funeral expenses of Joseph Karr, deceased and that the Court grant such other and further equitable relief as may be just and equitable in the premises."

The resistants thereafter amended their resistance by alleging that the alleged contract was unenforceable because evidenced by no written contract or memorandum as required by section 9933 of the 1939 Iowa Code.

Adella Karr and Katherine Schoonover, represented by the same attorneys as the plaintiffs, appeared and filed answer admitting the claim of plaintiffs. These two defendants and the defendants William K. Karr, administrator c. t. a., and the temporary administrator do not appeal.

The record shows that a jury was waived, but whether in writing or orally in open court does not appear, and trial proceeded to the court. As plaintiffs' first witness was being examined, the temporary administrator, U. M. Reed, appearing pro se and by his attorneys, Reed & Reed, objected to the witness as incompetent under Code section 11257. Mr. Marshall, attorney for resistants, then asked that the record show the objections made by the temporary administrator were also the objections of the resistants. Opposing attorneys then agreed that objections made by the temporary administrator or by the resistants should be considered as made by both. The trial then continued with the court passing upon objections when made, as in the trial of a law action.

After the conclusion of the trial, the court, on April 4, 1944, filed findings of fact and conclusions of law favorable to plaintiffs and directed attorneys for plaintiffs to prepare judgment entry in accordance therewith and to present the same to the temporary administrator for approval as to form. On April 8,

1944, the court entered judgment for plaintiffs. In its finding of facts the court found that, "sometime prior to 1940 Joseph Karr and William Karr entered into an agreement for the disposal of their properties after death, such agreement being shown by exhibits No. 22 and No. 21'' (these are, respectively, Exhibit A and B, set out in full in this opinion); prior to said time each of said brothers had executed wills; said agreement was based on a sufficient consideration; Joseph Karr had died without carrying out his part of the agreement as shown in said exhibits; the close association and interest of Ira, Joseph, and William in each other; the correspondence between Joseph and Ira showed that Joseph and William intended to change their old wills; the said exhibits were intended as final dispositions of property and if they had been properly witnessed they would have been valid wills; the fact that Joseph preserved them indicated, at least to some extent, that he considered them binding agreements; and "such agreement having been made it was not within the power of either brother to make other disposition of his property, than as indicated in said exhibits,'' unless by subsequent agreement; "consequently the will executed by Joseph in 1928 was not valid as devising or bequeathing any property to any person; equally consequently is the fact that William may not since the death of his brother make any disposition of his property other than as contemplated in said exhibits''; Joseph was greatly attached to and very solicitous for the welfare of William's wife and children, and was particularly concerned that the wife should not suffer any want, but should have the benefit of the joint labors of both himself and William; this solicitude and the close association and affection between Joseph and William made the disposition of Joseph's estate as shown by the exhibits "the natural and normal disposition of his estate even though nothing is provided for the family of his two sisters, who from the evidence, as the Court views it were never closely associated with either Joseph and William.''

The trial court's "conclusions of law'' are as follows:

"1st: That the will of Joseph Karr dated in 1928 and admitted to probate was invalid as an instrument passing title to anyone.

2nd: That all of the estate of Joseph Karr belongs to and is the property of William Karr and his family, as set out in exhibits 21 and 22, and controlled by the provisions of said exhibits.''

These findings of fact and conclusions of law were made a part of the judgment, which also contains this recital:

"* * * and the Court specifically finds that there is an obligation and duty on the part of Wm. K. Karr to carry out his part of the agreement as shown by Exhibits 21 and 22.

And * * * the Court being fully advised in the premises and in accordance with the said finding of facts and conclusions of law,

It Is Hereby Ordered And Adjudged:

(1) That the claim * * * be and is hereby established and allowed; and * * * subject to the payment of the valid charges * * * the legal representative of the estate * * * is hereby directed to pay (a) The claim of Thomas Karr * * * $5,000; (b) The claim of Marjorie Smith * * * $2,250; and (c) The claim of Wm. K. Karr, being the balance of the property of said decedent's estate, but not in excess of $130,000.''

A matter which appellants and appellees stress vigorously and at length, preliminary to their respective contentions on the merits, is the character of the review in this court. Appellants insist that the appeal is a trial anew in this court, and they present propositions for reversal as in a de novo appeal, but, as a precaution, they also assign errors as in an appeal in a law action, while the appellees urge upon us that the proceeding was tried below as an ordinary or law action and the review on appeal should be on errors assigned. The question may be debatable. The appellees point out that the proceeding was for the allowance of a claim in probate, triable as an ordinary action under Code section 11963; that a jury was waived by agreement; that objections were made and ruled upon as made; that no motion was made to transfer to equity; that the judgment was merely the allowance of the respective claims for specified amounts of money. On the other hand, the appellants call attention to the prayer for equitable relief and the allega-

tions in support thereof in the second amendment to the claim, respecting the ability and readiness of William Karr to perform the contract; the finding of the court that William must perform; that the duly executed and probated will of Joseph Karr was invalid as an instrument passing title to anyone, and that all of the estate belonged to and is the property of William Karr and his family. They urge that neither the claim, as amended, nor the judgment, was for damages; that both Thomas Karr and his sister Marjorie, at least on the face of the record, fared better under the probated will of Joseph Karr, which the court invalidated, than under the alleged contract which it upheld; that William K. Karr was not given a money judgment for damages but was decreed the "balance of the property of decedent's estate"; that the allegations and prayer of the plaintiffs' petition as amended, the findings of fact and conclusions of law, and the judgment of the court indicate the proceeding was tried and decided as a suit in equity for specific performance of the alleged contract. The appellants contend that the burden was upon the appellees to establish their claim by clear, satisfactory, and convincing evidence, as this court has many times held to be necessary in proceedings of a kindred nature in equity. See Williams v. Harrison, 228 Iowa 715, 723, 293 N. W. 41, 44, and cases cited therein. While the appellees argue that since it was an ordinary action at law and so tried and decided, they were required to establish their claim only by a preponderance of the evidence. See In re Estate of Dolmage, 204 Iowa 231, 234–237, 213 N. W. 380; In re Estate of Newson, 206 Iowa 514, 524, 219 N. W. 305; In re Estate of Stratman, 231 Iowa 480, 487, 1 N. W. 2d 636.

We do not feel called upon to decide the controversy between the parties as to whether the proceeding was an action at law, and so tried and reviewable in this court on assigned errors, or whether it was a suit in equity, and so tried and reviewable here de novo. It is unnecessary for our decision and we do not decide it, since it is our conclusion that under either method of review the judgment must be reversed because the appellees failed to establish "the mutual arrangement, compact, understanding and contract" which is the sole foundation and

essential basis of their claim, as alleged, by evidence of requisite sufficiency and quality, and the findings of fact and conclusions of law and the judgment of the trial court, under the whole record, are not sustained by substantial evidence. In re Will of Hagan, 234 Iowa 1001, 1006, 14 N. W. 2d 638, 641, 152 A. L. R. 1296; In re Estate of Clark, 228 Iowa 75, 99, 290 N. W. 13.

For. the purpose of disposing of this appeal we are going to accept the theory of the appellees respecting procedure, without passing upon its correctness, and consider the proceeding as an ordinary action at law in the trial court and before us. We are going to consider all of the evidence received, whether oral or written, as properly admitted and true, and the witnesses as competent. The appellants offered no testimony. So the evidence of the appellees is testimonially undisputed and uncontradicted. What evidence is there that the contract, as alleged, was ever made? There is no direct evidence that any such contract was ever written, or ever signed by the parties. There is no direct evidence that any such contract was ever orally made or executed. No witness testified to any admission or declaration of the deceased that he ever made or intended to make such a contract. But six witnesses testified for appellees, one of whom was William Karr; two were bankers, who testified to two bank transactions which we will refer to later. The other three witnesses testified briefly as to what they observed of the deceased and William about the store and the town. Both were about equally active in the operation of the store, though the deceased may have given more attention to the buying. One of these witnesses, who testified that the deceased and he "were what you might call chums for years," but who also testified that he did not know "whether Joe [deceased] was married, or not," testified that about five years before the trial (which took place in early 1944):

"I remember in particular one time he [Joseph] had some of those bond certificates on the counter, and other stocks they had, etc., and he remarked at the time that it was going to be a good deal the best for Will to take care of them, when he was gone."

There is no other testimony of any verbal statement of Joseph respecting his intentions or his acts as to his property.

William K. Karr testified as to the children of his father's family, their ages, deaths, and survivors; of the establishment of the store in 1889, and its active operation by him and Joseph until the latter's death in 1943; of Ira's having a one-third interest in the store until January 1, 1929, when he gave his interest to his two brothers.; of Ira's death in 1932, and of his leaving practically all of his property, amounting to about $80,000, in equal shares to Joseph and himself. He testified that Ira was a bachelor and took no active interest in the store, but lived at all times in Rock Island; that Joseph was a bachelor, and after his own marriage in 1894, Joseph at all times thereafter lived in the home of the witness and he saw him practically every day. The personal belongings of Ira came into the hands of Joseph and William, including correspondence between Ira and Joseph, some of which was introduced in evidence. William testified that in July 1940, on a desk in the store, for the first time he saw Exhibits A and B; that he read them over, taking possibly ten minutes; that then he looked at Exhibit B and there was a blank between the words "appoint" and "now," and no name was signed to it; that he looked at the exhibit again in about a minute or a half a minute, and the name "Joseph Karr" was written in the blank between the words "appoint" and "now," and the name "Wm. K. Karr" was written at the bottom of the exhibit.; he was sitting at the desk and at that time he saw Joseph Karr there; the next time he saw the two exhibits they were in "Joe's box" in the store safe to which the witness had access. There was testimony by those familiar with the handwriting of Joseph and William Karr that Exhibits A and B were all in the handwriting of Joseph except the words "Joseph Karr" written in the aforesaid blank in Exhibit B, and the words "Wm. K. Karr" written after the body of the exhibit, which were in the handwriting of William K. Karr. What was done with the exhibits after the occurrence of July 1940 testified to by William does not appear. There is nothing in the record to show when this "next time" was that William saw them in "Joe's box," or whether it was before or after Joseph's death. It appears from the testimony of William that both

exhibits were in the same condition when they were produced in court as they were that day in July 1940 when seen by William. Exhibit A was incomplete at that time and bore no signature of the purported testator, Joseph Karr, and it was in the same uncompleted condition when produced in court. And if the name "Wm. K. Karr," appearing at the bottom of the writing Exhibit B was the signature of William K. Karr, neither the writing of the same by him nor the execution of the instrument as a will was ever witnessed as required by statute. So far as the record discloses, nothing was ever done after July 1940 with these exhibits by William or Joseph Karr. In speaking of the incomplete condition of the two exhibits, the appellees say:

"In this case we are dealing with the conduct and acts of laymen, not lawyers. * * * They [the appellants] find much fault with him [Joseph Karr] or anyone else who acts as a human being does under ordinary circumstances, who does things without the guidance of a lawyer, and who does things in a manner which he might not have done, if a lawyer had been consulted."

One cannot read this record and come to the conclusion that the three Karr brothers were illiterate or uninformed men. They were keen, successful businessmen. They made money in the operation of the store and they added to their capital by provident investments in stocks and bonds. An examination of the administrator's inventory of Joseph's estate is sufficient proof of this. The stocks were all being sold on the exchanges and the appraisals were at the market price. There was not any "blue sky" stock listed. A glance through the inventory of stocks shows Armour & Company, American Smelting & Refining Company, American Telephone and Telegraph Company, Chrysler Corporation, Deere & Company, Ford Motor Company, General Electric Company, General Motors, S. S. Kresge Company, Libby, McNeil & Libby, Montgomery Ward, Pennsylvania Railroad Company, Phillips Petroleum Company, Radio Corporation of America, Socony-Vacuum Corporation, United States Steel Company, Standard Oil Company, F. W. Woolworth Company, among others. It is true that $40,000 of his estate came

from his brother Ira, but over $100,000 of his assets were apparently of his own acquisition.

Joseph was not a lawyer, but the fact that Exhibits A and B are in his handwriting is not evidence nor legitimate proof, under the record, that he had not consulted a lawyer or been advised as to the testamentary disposition of property. On May 26, 1928, he executed the will which was probated in Poweshiek county on October 5, 1943. There is no evidence that he drafted it. It was witnessed by two bankers, apparently the same persons who were witnesses for appellees in this case. On November 26, 1928, Ira sent him a copy of his will which he "had a lawyer put in shape." On July 15, 1932, Ira sent Joseph a copy of his last will, showing on its face that it had been prepared by one experienced in drawing wills. In the accompanying letter Ira explained to Joseph what is meant by the words in the will, "said children to take per stirpes and not per capita." There had apparently been some correspondence between Ira and Joseph concerning the execution of a will by William. On September 25, 1928, Ira wrote to Joseph:

"I can't go to a lawyer in Davenport without getting against a good sound charge. * * * I don't know the law points on these things but I think if you could get it shaped up to Will's satisfaction & give it to your lawyer there he would work out a will that would be legal. * * * I think you & Reed could work this out in two or three sessions—he would know the law points. * * * If you & Reed get something worked out you could send me a copy & I could submit it to Trust Co. & see what comment they make."

U. M. Reed, the temporary administrator, then and thereafter practiced law at Brooklyn.

That Exhibits A and B were left in an unchanged, incomplete condition for over two years and a half after July 1940, just preceding the death of Joseph, cannot fairly and reasonably be ascribed to the belief of either Joseph or William that they had performed or even attempted to perform such a contract as is alleged.

The record of these exhibits and of all matters shown in connection therewith offers no evidential fact or any reasonable,

logical, or legitimate inference of the making of any such contract as is alleged in appellees' claim. Instead of tending to prove the contract, they disprove it. Instead of being in pursuance of, referable to, or in performance of such a contract, they indicate quite the contrary. Instead of being consistent with the existence of such a contract, they are inconsistent therewith, and are more probative of its nonexistence. Joseph and William had some knowledge of the legal requisites of the execution of a will. It is established that Joseph had executed one, and there is evidence in the record that William had made a will about the time that Joseph did. It is reasonable to presume that if they had made the alleged contract they would have performed it. If they ever had such an agreement, or had even discussed the matter, the sounder and more reasonable deduction is that they mutually abandoned such a plan. If they did not abandon it, why did not William, on that day in July 1940 or thereafter, take Exhibit B and have it properly witnessed and fully executed, and why did not Joseph complete Exhibit A and execute it as he must have known it should be?

Appellees allege the contract was made ''during the period of time from the date of the death of Ira Karr in the year 1932 to July 31, 1940.'' There is nothing at all definite in the minds of appellees even as to the time of making the contract. They speak of it as developing during this period by a ''continuous flow.'' The first five years of this period is a complete hiatus with respect to any matter having the slightest reference to such a contract. Appellees in argument repeatedly quote from a letter of Joseph to Ira, dated July 24, 1932, as follows:

''Wm. & I are going to make new wills to meet new conditions * * *.'' But they do not complete the sentence. The full sentence is: ''Wm. & I are going to make new wills to meet new conditions as in cases of fixed amounts are now a greater per % than when made as out (totals of estate are much smaller today).'' This statement was apparently in answer to the following in Ira's letter of July 15, 1932, to Joseph, to wit:

''Dear Bro. Since market value of my estate is so badly reduced I have thought best to provide more percent to you

& Will—if things should recover during my time I might see fit to make changes, but think the will I made today (copy enclosed) more nearly fits the case now. * * * I note div. [dividend] has stopped on Nor pac [Northern Pacific] & Atchison—does this change your & Will's situation to an extent where more contribution should come from me—at present I am in position to do it if necessary—but you see I know so little of your & Will's affairs I can't figure it out & you will have to wise me regarding it.''

In their correspondence Joseph and Ira used no excess of words and no punctuation. The quotation from Joseph's letter set out above gives no indication that Joseph and Will at that time or at any time in the future contemplated making such a contract as alleged by appellees. It clearly indicates the contrary, and that any changes made might be reductions of bequests or a redistribution because of decreased values. Apparently, Joseph thought the increase in values after 1932 did not justify any change in his will of May 26, 1928. And the fact that William received $40,000 from Ira's will and his sister Mary Humphrey, Elizabeth Duvivier, and Elmer E. Simpson received but $1,000 each therefrom might very well have further influenced that decision. He was also advised by Ira in the latter's letter to him of November 30, 1928, of the ''nonlapse'' statute, Code section 11861. There was no occasion for him to change his will even after the death of the legatees Ira Karr, Rebecca Simpson, Mary Humphrey, and his niece, Elizabeth Duvivier, because those bequests would go to the respective heirs of each.

There is no evidence that William K. Karr ever changed any will he may have made, not at least until about a week before the trial, in January 1944, when he executed a will such as he contends was required by the alleged contract. Its execution was apparently prompted by the conclusion that he must perform the contract by the time of his death. The court rejected its offer in evidence by appellees.

Exhibits A and B each notes a previous payment of $2,750 by both Joseph and William to the appellee Marjorie Smith. The record shows that in April 1937, Joseph and William went to Des Moines, where Marjorie and her husband lived, and, in

company with a banker friend of the Karrs at Des Moines, went to look at a residence property. It was purchased for $5,500, and Joseph and William each paid one half thereof and deed was taken to Marjorie as grantee. Appellees went no further into the transaction, but on cross-examination, over objection of appellees, it was developed that in September 1942 the property was sold by Marjorie and the proceeds of the sale, amounting to about $7,100 net, were deposited by the same banker in equal parts in the separate accounts of Joseph Karr and William Karr in his bank. No attempt was made by appellees to show that Marjorie ever received any part of these proceeds. Appellees no doubt offered the direct examination to show the purchase of the house was a part performance of the alleged contract, but instead of so showing, the entire transaction rather indicates that if there ever was such a contract it was later abandoned.

For the same purpose appellees showed the purchase of a home for Katherine Schoonover near Washington, D. C. Her husband's name was Theodore. On August 26, 1942, the following letter was mailed to Mr. Schoonover:

"Ted —Enclosed— blank chs.

I feel it will be alright to go ahead as you suggest— & we will take care of it here. in—Katherine's Account—there is a credit to her account today—511.07 but when you write above this amount we will take care of it when it comes— .

Yours etc

Karr Bros

Joe"

It was shown that on September 2, 1942, Joseph's bank account had a balance of $8,464.49, and on September 3, 1942, William Karr's check for $1,800 was deposited in the account, and on the same day the check to Schoonover, filled out for $10,215.50, was charged to the account. The record gives no further information about the transaction. What the $1,800 check of William was given to Joseph for does not appear. Appellees argue that the payment to Katherine Schoonover was in performance and payment of the $5,000 legacy to her in each of the Exhibits A and B. Appellants insist that it is more than likely to have been a loan or gift or an advancement

on the $10,000 legacy to her in Joseph's will. There is no evidence that Joseph ever did anything to indicate that it was in any way a performance of any obligation of his under the alleged contract. And when William executed his will on January 7, 1944, in conformity to the terms of the alleged contract, he bequeathed therein $5,000 to Katherine in language identical with Paragraph B in Exhibit B. He made no deduction of $1,800, or of any other amount, from the bequest. The will of William K. Karr was not received in evidence but it is in the certified record.

To establish a contract indirectly and by extrinsic acts or circumstances it should fairly and definitely appear that these acts or circumstances were pursuant to the contract, or in performance thereof in whole or in part, or otherwise referable thereto. It has been a long-recognized rule of this court that any conduct, acts, or circumstances offered to show "part performance" in order to bring a case within the exceptions to the statute of frauds (section 11286) must be referable exclusively and unequivocally to the contract, and if they admit of explanation without reference to the contract they do not constitute part performance. See Williamson v. Williamson, 4 (Clarke) Iowa 279, 281; Sweeney v. O'Hora, 43 Iowa 34, 38; Fairall v. Arnold, 226 Iowa 977, 987, 285 N. W. 664, and cases cited. These were all cases in equity. In In re Estate of Runnells, 203 Iowa 144, 154, 212 N. W. 327, 331, a claim in probate tried to a jury, it was claimed that the oral contract was not within the statute of frauds, because a trip to Florida was part performance. Speaking through Chief Justice Evans, the court said:

"If it is to be said that the Florida trip was referable thereto, *it must be because the circumstances put in evidence permit no other rational hypothesis.*" (Italics ours.)

See, also, In re Estate of Hayer, 234 Iowa 299, 304–310, 12 N. W. 2d 520, 523–525, a claim in probate tried to a jury. All of the cases cited above, whether in equity or at law, involved land and the statute of frauds. The cause before us involves personal property. The appellants pleaded that the contract was unenforceable because not in writing as required

by section 9933, Code of 1939 (section 4 of the Uniform Sales Act). Appellees contend that this pleaded defense does not apply to a contract to bequeath personal property. Courts which have passed upon the question are divided. See 37 C. J. S. 624, 626, Statute of Frauds, section 141; id., 597, note 5, section 100; 49 Am. Jur. 561, Statute of Frauds, section 245. We do not find that this court has passed upon the question. In In re Estate of Hayer, supra, 234 Iowa 299, 12 N. W. 2d 520, it was found that the basis of the claim was real property. We do not find it necessary to decide the question, since for the purposes of this appeal we are treating all evidence received as admissible and the contract as not within the inhibition of said section 9933, and are requiring the appellees to establish the alleged contract and any acts claimed to have been done thereunder or referable thereto only by a preponderance of the evidence. The appellees have not met that burden. Appellees sought to establish the contract by evidence of certain circumstances, to wit, Exhibits A and B, and the two house transactions, together with the family relations to which we will refer later. It is our considered judgment that these matters do not make a prima facie case for appellees; that these circumstances and any legitimate inferences to be drawn therefrom fall far short of establishing the alleged contract; that they are of no probative force and raise only mere surmises and conjectures; that a number of the specific findings of fact of the court are without support in the record; and that its judgment has no evidence or inferences of any substance or probative weight or value to support it.

Appellees argue that Joseph had no particular affection for and did not care particularly for his sisters or their families. This statement has no basis in the record. The record fairly shows that the three brothers were closer in association, and perhaps in affection, than they were to their sisters and the children and grandchildren of the latter. Mrs. Humphrey was fairly well to do. Ira, in November 1928, wrote Joseph that the Humphrey estate would net around $65,000 or $70,000 and would be larger if land values increased. We may grant that Joseph was more interested in William and his family than in the heirs of his sisters, but the best evidence of that fact is

his own probated will. By it the specific bequests totaling $120,000 pass to the beneficiaries as follows:

| | |
|---|---:|
| To the Humphrey heirs | $16,666.66 |
| To the Duvivier heir | 2,000.00 |
| To the Simpson heir | 14,666.67 |
| To William K. Karr | 46,666.67 |
| To Thomas Karr | 10,000.00 |
| To Marjorie Smith | 10,000.00 |
| To Katherine Schoonover | 10,000.00 |
| To Adella Karr | 10,000.00 |

Of this estate the William K. Karr family receive the sum of $86,666.67, and they split the residuary estate of several thousand dollars more, equally. Joseph gave abundantly from his property to the William Karr family.

The appellees did not disclose to the trial court just where they found this will which Adella Karr presented for probate. Where it was found and its safeguarding might have thrown considerable light on Joseph's interest and care in its preservation. But he did preserve it without change or amendment. He evidently concluded it was the fair disposition to make of his property. He may have had in mind that Ira gave all of his estate to himself and William, and but $3,000 to his sisters and their heirs, and that they were entitled to a fair share of his bounty.

In Peck v. Foggy, 199 Iowa 922, 925, 202 N. W. 754, 755, in a quite similar case, Justice Evans said:

"In putting the evidence to such tests, the first quest of the judicial mind is for anchorage, — something in the record which can be 'tied to' as a *verity*; some fact which is indisputable, or which has been well proved in the record. The *verity* in the record before us is a written lease."

The "*anchorage*" and the "*verity*" in this case is not Exhibit A or B, either house transaction, or the family background, or the combination of them, but the undisputed, adjudicated will of Joseph Karr. To set aside this instrument and the judgment of its probate, by the equivocal, inconclusive circumstances, and

conjectures deduced from them, would set a precedent most dangerous to testamentary dispositions of property.

Speaking of a similar claim, the Supreme Court of Pennsylvania, in Graham v. Graham's Executors, 34 Pa. 475, 481, said:

"Such claims are always dangerous, and, when they rest upon parol evidence, they should be strictly scanned. *Especially, when an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes, or that which the decedent has directed by his will, should it meet with no favour in a court of law.*" (Italics ours.) (Quoted with approval in Holmes v. Connable, 111 Iowa 298, 301, 302, 82 N. W. 780, and in Ross v. Ross, 148 Iowa 729, 734, 127 N. W. 1034.)

The conclusion of law of the trial court that the will of Joseph Karr dated May 26, 1928, admitted to probate by the District Court of Poweshiek County, Iowa, on October 5, 1943, which conclusion is made a part of the judgment appealed from, is set aside, and the order or judgment of probate is reinstated and stands as of the verity, force, and effect which it had prior to the filing of the findings of fact and conclusions of law and the entry of the judgment herein.

The appellants assigned as other errors: 1. The holding that there was consideration for the contract; 2. in holding that William had performed the alleged contract; 3. in holding William was a competent witness under the "dead man statute"; 4. in holding that William was not estopped to establish the claim by his qualifying as administrator c. t. a.

In view of our decision we need not pass upon these assignments of error.

It appearing to the court from the record made that all evidence available in support of the appellees' claim was produced in the trial thereof, and that nothing would be gained by a retrial, it is the conclusion of the court that the judgment is reversed and remanded with directions that the trial court enter judgment dismissing the claim of appellees.—Reversed and remanded with instructions.

All JUSTICES concur.