RICHARD H. JAMES, SR., appellant, v. FRANK JAMES et al., appellees.

No. 50004.

(Reported in 105 N.W.2d 498)

OCTOBER 18, 1960.

REHEARING DENIED DECEMBER 16, 1960.

Welch & Welch, of Logan, and R. K. Brannon, of Denison, for appellant.

Page & Nash, of Denison, for appellees.

THORNTON, J.—Plaintiff's action is brought in three divisions. In Division I he asks a trust be impressed in his favor on all of the property in the estate of his mother, Nora B. James. His claim is, his mother agreed to deed or will her property to him and in consideration thereof he quitclaimed to his mother all of his, plaintiff's, interest in his father's estate. In Division III he claims if the contract is not to be fully enforced his brother, defendant Frank James, and his mother fraudulently overreached him by false promises and because of them he quitclaimed all his interest in his father's estate and refrained from bringing an action to set aside a deed to a 110-acre farm given by his father and mother to defendant Frank James and asks all of the property together with a claim for rent set up in Division II be held to be still a part of his father's estate and as such be divided between plaintiff and defendant Frank James. He argues he is entitled to this relief because under the circumstances of his conveying to his mother a constructive trust arose and she held the property for his benefit. Division II is a claim for rent due from defendant Frank James to his mother during her lifetime and now a part of her estate.

The answering defendants, Frank James and Verne James, his wife, and Frank as executor of his mother's estate, admit the

conveyance of the 110-acre farm to Frank, deny all other allegations, plead laches, and the claim for rent cannot be made by plaintiff, but only by the executor of the estate. The district court found for the defendants and dismissed plaintiff's petition. We agree with this result.

This action is based on dealings between plaintiff, defendant Frank James, and their parents in early winter of 1931. William James and Nora B. James were husband and wife and the parents of plaintiff, whose full name is Richard Howard James, usually called Howard or Bud, and defendant William Frank James, usually called Frank. Frank was 56 and plaintiff 54 years of age at the time of trial.

In 1931 William, the father, owned a 110-acre farm in Shelby County, a 72-acre farm across the county line in Crawford County, and a house and three lots in the town of Astor, Crawford County, Iowa. William and Nora were living in the home in Astor. Frank was living on the 110-acre farm and farming it in partnership with his father, William. Bud, plaintiff here, was living on the 72-acre farm, and farming it under a cash-rent lease with his father. Prior to that the father and two sons farmed all of the land under a three-way partnership, but friction arose and the father had a partnership with each son, and in 1930 started on a cash basis with plaintiff.

The actions of the family of which there is documentary evidence are: On February 7, 1931, William and Nora conveyed the 110-acre farm to Frank by warranty deed reserving to the grantor a life estate. This deed, Exhibit 3 in the record, was recorded February 11, 1931, and recites a valuable consideration. On February 12, 1931, William died unexpectedly and intestate. On February 17, 1931, Frank and his wife together with plaintiff and his wife executed a quitclaim deed to their mother, Nora, to the 72-acre farm and house and lots in Astor. This quitclaim deed recited consideration of natural love and affection, is Exhibit 14, and was recorded February 18, 1931. The notary in Exhibit 3 and Exhibit 14 was R. C. Jackson. On March 27, 1931, Nora executed a quitclaim deed to Frank to the 110-acre farm for a recited consideration of $1. This deed was recorded March 28, 1931, the notary appearing thereon is

Douglas Rogers, the attorney who handled William's estate. It is Exhibit 24. Nora died January 13, 1957, at the age of 81. She left a will executed at Denison, Iowa, on December 10, 1954. The will provided for an equal division of personal effects to plaintiff and Frank, the sale of the farm and Astor property, giving Frank the right to purchase the farm for 90% of the appraised value, the proceeds were to be divided $500 to Regina, plaintiff's first wife, $300 to each of plaintiff's five children by his first wife, $100 each to Frank and his wife, Verne, one half of the remainder to Frank, and one half to Frank as trustee in a spendthrift trust for plaintiff to be paid at the rate of $100 per month, and upon plaintiff's death if not then exhausted to plaintiff's five children named in the will.

At the time of his death William held three of plaintiff's notes, one dated September 1, 1929, due in one year in the sum of $1735.10 upon which was endorsed a payment of $200. This note was given for the purchase price of farm partnership property. The other two were for rent, were dated March 1, 1930, due in eleven months, one in the sum of $576 upon which had been endorsed a payment of $40, and the other in the sum of $175. All three of these notes were endorsed "without recourse" by plaintiff and Frank. They were inventoried in William's estate and delivered by the administrator to Nora. The notes were inventoried in Nora's estate at no value.

There were also letters between Nora and plaintiff and approximately $1200 worth of notes upon which Nora cosigned for plaintiff and which she paid after he left the 72-acre farm.

As it was apparently a matter of common knowledge among all of the witnesses, a will of the father, executed and burned before his death, should be mentioned. Frank testifies this will was shown to his wife and him at the time his father delivered the deed, Exhibit 3, to him, and after stating " 'this is no further use' " threw it in the cookstove. The will provided for the estate to be divided between plaintiff and Frank, and their mother was to get the use of it at $3 per acre.

 I. It is well settled plaintiff's proof to establish a contract to devise must be clear, satisfactory and convincing. Sharpe v. Wilson, 181 Iowa 753, 161 N.W. 35; Stennett v. Sten-

nett, 174 Iowa 431, 156 N.W. 406; Garman v. Wettengel, 199 Iowa 1150, 203 N.W. 266; and Manchester v. Loomis, 191 Iowa 554, 181 N.W. 415. It is equally well settled evidence to establish a constructive trust must be clear and convincing. Pap v. Pap, 247 Iowa 371, 73 N.W.2d 742; and Copeland v. Voge, 237 Iowa 102, 20 N.W.2d 2.

II. Plaintiff claims shortly before the deed, Exhibit 3, was executed by his parents there was a family conference. He testifies his father asked him to come. The parents and two sons were present. He says the deed was discussed and that William and Frank finally prevailed upon Nora to sign. (If there is one thing that stands in this record it is, Nora did not want to sign the deed, Exhibit 3, to Frank. All witnesses agree on this.) In answer to his inquiry as to where he came in, his father said he, plaintiff, would get the lower eighty (the 72-acre farm) after his mother was through with it, he would have to pay his mother $3 per acre as long as she lives. He says:

"They said they would draw up a contract in Manilla. Get R. C. Jackson to draw it up to that effect, and they said they would all have a copy of it. My mother or my dad and Frank said there would be a contract drawn up and we would each have a copy, on this $3.00 an acre deal."

Speaking of what Frank agreed to, he said, "He asked my mother if she would make a will out in my favor, leaving me everything, and she agreed to do that if we would sign the deed over to Frank for the hundred and twenty acres." (The 110-acre farm)

This last statement is wholly inconsistent. Nora did not want to sign the deed to begin with and it seems highly unlikely she would agree to will the 72 acres to plaintiff if "we" would sign the deed. The only signatures required were of the parents. Frank denies this meeting took place.

It should be pointed out the parties waived all objections to the competency of witnesses under the provisions of Code section 622.4, the dead man statute. However, this does not render such evidence persuasive.

The discussion indicated, if anything, a contract would be entered into at a later date and they would have R. C. Jackson, the banker and notary, draw the contract.

After William's death plaintiff contends there was an agreement with his mother, Nora, and Frank to the effect a contract would be drawn by R. C. Jackson. The conversations, out of which plaintiff claims this agreement, took place after William's death and before the quitclaim deed, Exhibit 14, was executed in R. C. Jackson's office at the bank. The place of the conversations was the home in Astor. Plaintiff testifies he told his mother and Frank, "* * * before I give a quitclaim deed I want some kind of security to know I am going to get my end of it after you are through with it." He testifies, "Frank says: 'Mother, will you give a will like my dad asked you to? Will you follow on through with it?' " and his mother said, " 'Yes, I will.' " He also testifies they agreed to sign a contract to be drawn by R. C. Jackson. The terms of this contract are indefinite but it seems fair to say each son was to pay $3 per acre to his mother each year as long as she lived for the land received or to be received, and Nora, the mother, was to will all of her property to plaintiff. Also the mother was to give Frank a quitclaim deed.

If the above is true plaintiff is entitled to relief here. The execution of the quitclaim deed to his mother is consideration for her agreement to will her property to him. Manchester v. Loomis, supra.

III. However, the foregoing testimony of plaintiff is rendered far from clear, satisfactory and convincing by the following. At one point in his testimony in regard to conversations with his mother and Frank after his father's death he states, "* * * but my mother did say as soon as I got out of debt that she would make out a will in my favor." After the family conference before the father's death, the father, mother and Frank went to R. C. Jackson to draw the deed. Plaintiff was not there, and of course a contract was not drawn. Again, after the father's death, plaintiff, Frank, their wives and mother were in R. C. Jackson's office to draw the quitclaim deed, Exhibit 14. If plaintiff is to be believed, the contract was to be drawn by Mr. Jackson and the purpose of it was to secure to plaintiff what he now claims. But we do not find one word about such a contract while the parties were in Mr. Jackson's

bank. There is no explanation of why it was not drawn at that time. He does say Frank at a later time said he would get it later. There is a further discrepancy here. On March 27, 1931, Nora gave Frank Exhibit 24, a quitclaim deed to the 110-acre farm, at that time Frank and his mother entered into an agreement wherein he was to pay her $3 per acre on the 110-acre farm. Frank's testimony is, plaintiff caused him no end of trouble concerning the deed, Exhibit 3, and his mother was not too happy about this deed, "* * * she kept talking about my father's will—it provided for payment by each of us, on a $3 per acre basis; and in order to stay out of just such a mess as we are in at the present time, I agreed, under the advice of Mr. Jackson and the attorney for the estate, Mr. Rogers, to pay my mother $3 an acre and put her under the same basis as she was under the will, and when that understanding and agreement was reached in Rogers' office on the 27th or 8th day of March 1931, my brother was there, my mother was there, and we both agreed to the same identical thing."

This is the strongest testimony in the record in support of plaintiff. However, there is no showing of what their mother agreed to do, if anything, and further, if we understand plaintiff's testimony in regard to Exhibit 24, the quitclaim deed from Nora to Frank on the 110-acre farm, he was not present when it was executed and he did not sign or receive a copy of an agreement to pay his mother $3 per acre.

Further, plaintiff wrote three letters to his mother in 1944 and 1945, the statements and claims in each of them are inconsistent with the claim he makes now. In one letter is this:

"I deeded you one third of that seventy-two acres and property there in Astor to you. The one third that I claim includes the buildings and about twenty-five or twenty-six acres. * * * If you don't [settle], I want a deed to my share. * * *."

In another letter he propounded to his mother five questions, the fourth of which is, "4. Why you think that you should not turn back to me what I deeded to you."

There is not one word in these letters indicating plaintiff at that time thought he had an agreement his mother was to will all of her property to him. And plaintiff makes no explanation.

Plaintiff does not actually testify why he gave the quitclaim deed, Exhibit 14, to his mother. He does say Mr. Jackson advised his brother and him to execute the deed. Frank says Mr. Jackson advised this course of action because of plaintiff's financial condition. At that time plaintiff admits he was indebted to the Carroll bank in the sum of $21,000 or $22,000. Frank testifies he intended to give his mother absolute ownership when the quitclaim deed was given and plaintiff did not say anything about it. There is evidence in the record the father, William, intended to deed the 72-acre farm and the house in Astor to Nora before his death but did not live to carry out this intention. That plaintiff intended to convey absolute ownership to his mother by Exhibit 14 because he knew of his father's wishes or because of his own indebtedness or both is just as consistent with this record as plaintiff's claim that he deeded it in consideration of his mother's agreement to will all of her property to him.

What has been said disposes of plaintiff's Division III. We are not convinced plaintiff was induced to act by false promises on the part of his mother or his brother, Frank, or that the circumstances give rise to a constructive or implied trust. Rather the contrary appears.

We have carefully examined and re-examined the testimony of plaintiff's aunt, Pearl Schill, and his niece, Della Prince, also the testimony of plaintiff's grandniece, Barbara Nissen, and cannot find such testimony establishes plaintiff's claim. Pearl Schill, in testifying to what Nora, her sister, had told her about her (Nora's) will, at one point says, "I said, 'Nora, did you give Bud the 80 acres?' and she said, 'Yeah.'" And later in her testimony she says, "She told me she had fixed the will so Bud would get part of his estate now and part of it later in his old age." These statements are not contradictory but they are inconsistent. That is true of all of the testimony of this witness. The testimony of Mrs. Prince relative to the actions of the James family shortly before and after the death of Will James is so confused and overrun with her conclusions and elicited by leading questions we give it little or no probative value. The testimony of the aunt and two nieces relative to

.Frank's statements after his mother's death in California if believed would at most indicate Frank was of the opinion his mother had left the property to plaintiff.

Plaintiff argues the deed to Frank, Exhibit 3, constituted an advancement and that he, plaintiff, owned two thirds of his father's estate when he gave the quitclaim deed, Exhibit 14, to his mother. Section 636.44, Code of Iowa, 1958 (Section 12029, Code of Iowa, 1927). If we concede this is true the result is not changed. In any event he conveyed his entire interest in his father's estate. It is clear from plaintiff's testimony and his letters to his mother he was not aware his interest was more than one third, if it was.

IV. Plaintiff also argues he was not conveying his property to his mother because of his indebtedness. He contends he had a homestead interest in the 72-acre farm. This may be true. Wright v. Flatterich, 225 Iowa 750, 281 N.W. 221; and Kramer v. Hofmann, 218 Iowa 1269, 257 N.W. 361. And it has long been settled a conveyance of a homestead is not a fraud upon creditors as it is not subject to their claims. Wells v. Anderson, 97 Iowa 201, 66 N.W. 102, 59 Am. St. Rep. 409. Here again there is no showing by plaintiff of an awareness of his rights and none from which it can be determined if his then indebtedness was such his homestead interest would be exempt.

In addition to the foregoing plaintiff did leave the farm in late summer of 1936 when the corn crop was burnt out. His mother was forced to take over the operation of the farm. The next year she started renting the 72 acres to Frank. Plaintiff at the time he left was, as mentioned, in debt on notes cosigned by his mother to the extent of $1200 which she paid. Also there is evidence plaintiff's drinking habits did not meet with his mother's approval as well as evidence his conduct in the past was not such as would induce his mother to so contract with him.

V. It is our duty to consider this appeal de novo. Snater v. Walters, 250 Iowa 1189, 98 N.W.2d 302. And to scan with care the transaction wherein plaintiff transferred to his mother all of his interest in his father's estate without consideration. Bruner v. Myers, 212 Iowa 308, 233 N.W. 505, 235

N.W. 726. We have made a critical examination of all of the evidence and the circumstances attending the transfer and it is our holding plaintiff has not proved by clear, convincing and satisfactory evidence his mother agreed to will him all of her estate. At the best the evidence on this question is in equipoise and therefore plaintiff must fail.

VI. The able trial court has correctly decided the question raised in plaintiff's Division II for rent allegedly due from Frank to his mother. We quote its statement: "* * * it is the rule that when an executor is himself indebted to the estate it is assumed that he has done his duty and paid his debt and that he is to be accountable as executor for the money thus supposed to have been collected. In case of failure to account for it in his final report the matter can then be inquired into upon objections to that report. That this is the remedy, and said to be the only remedy, is apparent from an early decision in Iowa. See Kaster v. Pierson, 27 Iowa 90. See also McEwen v. Fletcher, 164 Iowa 517, (146 N.W. 1, Ann. Cas. 1916D 631), In re Estate of Windhorst, 227 Iowa 808, (288 N.W. 892)." 3 Iowa Practice (Tollefson) section 656, page 456; section 753, page 539. —Affirmed.

All JUSTICES concur.