HOMESTEADERS LIFE ASSOCIATION, Appellee, v. B. I. SALINGER el al., Defendants; CARROLL COUNTY STATE BANK, Appellant.

No. 40660.

MARCH 10, 1931.

REHEARING DENIED APRIL 11, 1931.

Frank H. Dewey and Lee & Robb, for appellee.

Salinger, Reynolds & Meyers and Davis, McLaughlin & Hise, for appellant.

KINDIG, J.—This appeal involves a question of priority between two mortgages. On the one hand, the plaintiff-appellee, The Homesteaders Life Association, claims its mortgage is a first lien on certain land in Carroll County, and, on the other, the defendant-appellant, The Carroll County State Bank, contends that its mortgage is superior. The following parties, B. I. Salinger, Lucy M. Salinger, Central Trust Company, of Des Moines, Iowa, L. A. Andrew, Receiver of the Central Trust Company, Green Bay Lumber Company, Glidden Farmers Elevator Company, of Glidden, Iowa, and others, are defendants in this cause, but do not appeal, and the contest is entirely between The Homesteaders Life Association, appellee, and The Carroll County State Bank, appellant. A statement of the historical facts relating to these mortgages will aid in the discussion at this place.

B. I. Salinger, on August 31, 1917, by warranty deed obtained title to 751 acres of land in Carroll County. It seems that Salinger had an equitable interest in this land before receiving the deed. In any event, on the day the deed was received, he executed a mortgage, covering a portion of the land, to the Royal Union Mutual Life Insurance Company for the purpose of securing $31,000. Another mortgage was also executed by Salinger to the same company, encumbering another

part of that land. The amount of this last-named mortgage was $21,500. These two mortgages to the Royal Union Mutual Life Insurance Company are of equal priority on their respective tracts. As before said, they are for different amounts on separate portions of the Salinger farm. Both mortgages to the Royal Union Mutual Life Insurance Company were recorded, and, on February 23, 1921, the Royal Union Company assigned each of them to the Central Life Assurance Society. Before the assignments on February 23, 1921, but after the execution of those mortgages to the Royal Union Mutual Life Insurance Company August 31, 1917, Salinger, on December 28, 1918, executed a second mortgage (second to each Royal Union mortgage above-named) covering the aforesaid land for the purpose of securing: First, $28,000 then loaned to him by; and, second future advances to be made through The Carroll County State Bank, the appellant. That second mortgage was also recorded.

Then, on March 12, 1921, Salinger executed a third mortgage (the two Royal Union mortgages being first, and the appellant's mortgage second) for $8,072.25. Said mortgage was given to the Green Bay Lumber Company. There was contained in each first mortgage made to the Royal Union Mutual Life Insurance Company, an acceleration clause providing that upon failure to pay interest when due, the entire indebtedness might mature at the option of the mortgagee. More than one year's interest was due upon the Royal Union mortgages in April, 1923, when Salinger, in order to discharge the first mortgages aforesaid, then held by the Central Life Assurance Society, applied to the Central Trust Company, of Des Moines, for a new loan upon the 751 acre tract. The entire indebtedness due at that time under the first mortgages, including both principal and interest, was $56,338.32. Application for this loan was made in writing, which contained the following provision:

"I (the applicant) will furnish an abstract satisfactory to the mortgagee at my expense showing the title perfect in me, and that the mortgage given to secure this loan is a first lien."

Accompanying the written application just mentioned was an appraisement of the 751 acre tract made by J. P. Hess, President of the appellant bank. For the purposes of this new loan, the tract was divided into three parts so that three new

mortgages were then executed by Salinger in order to defray the obligations of the aforesaid Royal Union mortgages, and other expenses. Of the new mortgages, one was for $28,000, secured on a 280 acre tract, another for $16,000 encumbered 160 acres, and the third was for $31,000, secured on the remaining 311 acres. Thus the aggregate of the three new mortgages made by Salinger to the Central Trust Company was $75,000. Those new mortgages were dated April 5, 1923, and recorded April 30, thereafter. An assignment of the $16,000 new mortgage aforesaid, covering the 160 acres, was later made by the Central Trust Company to the appellee. Likewise, the Central Trust Company assigned the $28,000 mortgage, covering the 280 acres, to the New York Life Insurance Company, and the $31,000 mortgage encumbering the 311 acres, to the Mill Owners Mutual Insurance Company. It is the $16,000 mortgage aforesaid that the appellee claims is prior to the $28,000 mortgage held by the appellant, as before explained. Appellant's $28,000 mortgage provided that the same should be security for future advances made by it to Salinger, as previously suggested. Because of the original $28,000 and such future advancements made by the appellant to Salinger, it is claimed the amount now due the bank aggregates $67,333.79. On the face of the record under the above statements, it is apparent that appellee's $16,000 mortgage is not first. Consequently, it is necessary to relate further facts in order to make plain the respective claims of appellant and appellee in the premises.

Again recalling that the Central Life Assurance Society held the two mortgages made by Salinger to the Royal Union Mutual Life Insurance Company, which, including interest, totaled $56,388.32, it will be remembered that the new loan, just described, was made for the purpose of satisfying that indebtedness. Accordingly, the old Royal Union Mutual Life Insurance Company mortgages were paid from the proceeds of the new loan, above mentioned, which was made by Salinger to the Central Trust Company. When thus paid, the Royal Union Life Insurance Company mortgages were satisfied of record. So, too, the Green Bay Lumber Company mortgage of $8,072.25 was released of record or made subsequent to appellee's mortgage. Then, so far as material for our present consideration, the only mortgage appearing upon the record as a superior lien against

the real estate in question is the one held by appellant. In an effort to place the three Central Trust Company mortgages prior to appellant's security on the land, John P. Hess, President of the appellant bank, on June 23, 1923, attempted to execute for and on behalf of the appellant a written instrument, which, so far as material, reads as follows:

"John P. Hess, President of the Carroll County State Bank, a corporation, (appellant), and being also its chief executive officers and on full authority to act for said corporation in the premises, and for value received, make the following agreement on behalf of said corporation. * * * Now, in consideration of the premises, the said Banking corporation (appellant) agrees that said mortgages (the three Central Trust Company mortgages, one of which is now held by appellee, as before explained) and each of them (including the one assigned to the New York Life, and the other to the Mill Owners Insurance Company) shall have priority over any mortgages or lien that said banking corporation (appellant) now has upon any lands covered by any of the said mortgages (the three Central Trust Company mortgages) made by said Salinger and his said wife to the Carroll County State Bank.

(Signed) Carroll County State Bank,<br>by John P. Hess, President."

There was no corporate seal impressed upon the above instrument of waiver or release. Following the foregoing, and on May 2, 1924, the appellant again executed another waiver for its mortgage in favor of the three Central Trust Company encumbrances. Impressed upon the second waiver was appellant's corporate seal. Salinger prepared the first waiver or release, submitted it to the appellant for execution, and then delivered the same to the Central Trust Company. Likewise, he took the second waiver or release to the appellant for execution.

Appellee did not receive the assignment of the $16,000 mortgage from the Central Trust Company until October 4, 1923, which was after the first waiver or release, but before the second. The contention is made by appellee that it paid full value to the Central Trust Company for the $16,000 mortgage, and that because of the record, the facts, and circumstances, its lien on the land is prior to that of appellant under the latter's mort-

gage. Contrary to that, however, appellant insists that its mortgage is prior for the following reasons: First, that the written waiver or release did not have impressed upon it the corporate seal, and therefore, did not invite appellee to consider it as a corporate act; second, that the waiver or release aforesaid was signed by Hess without any authority from the bank, and consequently the release was not in.fact a corporate act; and, third, that the instrument was without consideration.

At the conclusion of the trial in the district court, that tribunal entered a judgment and decree for appellee, from which the appellant appeals.

I. Under the. record, it is fair to conclude, as did the district court, that the first waiver or release aforesaid did not have impressed thereon the corporate seal, although at the time the corporation had adopted, and also possessed, a seal. Section 9439 of the 1927 Code provides:

"The use of private seals in written contracts, or other instruments in writing, by individuals, firms, or corporations that have not adopted a corporate seal, is hereby abolished; but the addition of a seal to any such instrument shall not affect its character or validity in any respect."

Additional to this legislation are the following sections, contained in the same Code:

"10066. All instruments containing a power to convey, or in any manner relating to real estate, shall be held to be instruments affecting the same * * *"

"10067. In the execution of any written instrument conveying, incumbering, or affecting real estate by a corporation that has adopted a corporate seal, the seal of such corporation shall be attached or affixed to such written instrument."

"10068. If the corporation has not adopted a corporate seal, such fact shall be stated in such written instrument."

Therefore, appellant urges that appellee had no right to rely upon the purported release (the first release) when it paid its money to the Central Trust Company for the $16,000 mortgage. Without the corporate seal, appellant argues there was no presumption of authority to execute the instrument. Moreover, appellant concludes that without such seal the in-

strument in fact did not constitute a corporate act. As a result, appellant maintains that the burden rests upon appellee to establish that the mortgage held by the former in fact has been released so far as the latter's mortgage is concerned. It is appellant's theory here that there was no consideration for the second release, and that appellee had paid out its money, relying not on the second, but the first release.

If a contract or other written instrument is, under the seal of the corporation which bears the corporate signature, executed for the corporation by its officers, it will "be presumed not only that the contract was in fact executed but that its officers had power to make it." Wisconsin Lumber Company v. Telephone Company, 127 Iowa 350 (local citation, 355). And likewise see Morse v. Beale, 68 Iowa 463; Goodnow v. Oakley, 68 Iowa 25; C., B. & Q. Ry. Co. v. Lewis, 53 Iowa 101 (local citation, 113); Blackshire v. The Iowa Homestead Co., 39 Iowa 624. When the seal is attached, the presumption aforesaid arises, yet this in itself does not mean that all corporate contracts are invalid unless the corporate seal is affixed.

"It has become the well established doctrine, that corporations of all kinds may be bound by contracts not under their seals." Ring v. The County of Johnson, 6 Iowa 265 (local citation, 269).

To the same effect see Merrick v. The Burlington & Warren Plank Road Co., 11 Iowa 74; Muscatine Water Co. v. Muscatine Lumber Company, 85 Iowa 112. Section 10067, however, requires that the corporate seal shall be affixed to instruments "affecting real estate". Does that section make the contract invalid if the corporate seal is not affixed? Appellant contends that it does. See Ring v. County of Johnson (6 Iowa 265), supra, at pages 271-72; Shropshire v. Behrens, 13 S. W. 1043 (Texas); Nucleus Association v. McElroy, 18 Atl. 1063 (Pa.); Fleckner v. Bank, 21 U. S. 338, 342. For the purposes of this opinion, however, we assume, without deciding, that the first waiver or release was not a corporate act because it lacked the corporate seal. Nevertheless this does not mean that under the record appellee's mortgage is inferior to the one held by appellant. Finding, as we do: First, that the corporation intended its own mortgage to become inferior to the security held by

appellee, second, that there was sufficient consideration therefor; and, third, that the second waiver or release was in confirmation of the corporate act, as thus contemplated, it must result that appellee's mortgage is a first and prior lien on the real estate in question. The basis for this conclusion will be found in the following discussion. Said waiver or release was executed by an officer having authority to perform such act. John P. Hess, the president, was authorized to satisfy and release mortgages for the corporation, so far as the articles of incorporation are concerned. Section Two, Article Eleven, of the appellant Bank's articles provides:

"Releases of mortgages and other liens held by the corporation and satisfaction thereof may be made, executed, and acknowledged by the president, vice president, or cashier."

Hence, Hess, the president, when executing the waiver or release in question was acting within the express power named in said article. Is that sufficient to bestow upon him the power to perform such corporate act?

"It is well settled in this state that the office of president of a corporation in itself confers no power upon him to bind it by contract. His power must be determined by the *organic law of the corporation* or by delegation of authority by its managing officers, or be implied from the habit or custom of transacting the business of the corporation." (The italics are ours). First National Bank v. Cement Products Co., 209 Iowa 358.

Also to the same effect see Steinke v. Yetzer, 108 Iowa 512; White v. The Elgin Creamery Co., 108 Iowa 522; Ney v. Telephone Co., 162 Iowa 525; Gilman v. Heitman, 137 Iowa 336; Whitlatch v. Bond & Mortgage Co., 199 Iowa 65; Groeltz v. Armstrong Real Estate Company, 115 Iowa 602; Ida County Savings Bank v. Johnson, 156 Iowa 234.

Here, then, the president derived his authority from the organic laws of the corporation, to wit, its articles. Assuming that the appellee, when it took its mortgage from the Central Trust Company, had no right to rely upon the presumption of regularity because the first waiver or release was not impressed with the corporate seal, yet, as before said, this does not necessarily mean that there was in fact no waiver or release. The

argument is presented by appellant that although the president might waive or release when the sum secured by the mortgage is paid to the corporation, yet he could not do so on any other basis. If, however, the president, who was authorized by the articles to execute a release or satisfaction for a mortgage, was in addition thereto empowered to so waive and release even though the mortgage was not in fact paid, then, in truth, appellee's mortgage became superior to that held by appellant. Did the president have authority to thus waive or release for the corporation, even though its mortgage had not been paid? Manifestly the president did possess such power under the facts and circumstances revealed in this record.

For a great number of years, John P. Hess had operated a private bank at Carroll, Iowa, when in 1917, he incorporated the business, and then continued as president of the concern. After the incorporation, there were employed in the bank, in addition to the president, four adult children of Mr. Hess,— two boys and two girls. So far at least as public appearances were concerned, the Hess family continued to operate the institution after the incorporation, the same as it had done when the bank was operated as a private concern. This bank was capitalized at $75,000, according to the par value of its stock, of which stock the president, Hess, held a majority. His stock amounted to $45,000 in par value. During these years Salinger, the mortgagor, was attorney for Mr. Hess and the bank.

With the foregoing facts and circumstances as a background, it is now important to recall again the situation in reference to the mortgagor's indebtedness at the time the purported release was executed. There was approximately $56,000 due under the Royal Union Mutual Life Insurance Company two mortgages when Salinger applied to the Central Trust Company for the $75,000 loan, of which appellee's $16,000 mortgage is a part. As before seen, the interest on the Royal Union mortgages was more than a year past due. Appellant obviously was not in a position to pay off that prior $56,000 mortgage. At that time banks throughout the state were not assuming obligations unnecessarily because the financial situation was rather hazardous. According to the record, the mortgagor had borrowed more than the appellant bank was authorized to loan him, because additional loans were made for Salinger, through

Mrs. Salinger and Mr. Ferguson. Consequently, it appears certain that the appellant bank could not loan him any more. Salinger's indebtedness to appellant at that time was approximately $67,333.79, as before indicated. An additional loan was no doubt out of the question. Apparently the appellant bank had no choice. It was necessary to refinance Salinger's obligations. To accomplish that object, the new $75,000 loan was made with the Central Trust Company. But before such refinancing could be made under the circumstances, it was necessary to release appellant's mortgage. Only one way of refinancing was open to appellant and Salinger, and that was to negotiate and obtain a new first mortgage. Such new mortgage, however, could not be procured unless the bank would release its own security or subordinate it to the contemplated new incumbrance. Rather than release its own mortgage and perhaps permit other incumbrances to become first, the appellant bank in lieu thereof waived its lien on the land as to the new mortgage. Or, in other words, the appellant bank made a partial release of its mortgage; that is to say, it released the same so far as the Central Trust Company's $75,000 contemplated mortgage was concerned. Unquestionably the section from the articles of incorporation aforesaid is broad enough to authorize the president of the bank to execute the waiver or partial release under those circumstances. That article permitted the release and satisfaction of mortgages through instruments executed by the president. By acting thereunder, and executing the waiver or release in question, the appellant bank, through its president, only exercised power in a limited degree which it had authority to exercise to an unlimited extent; that is, the President could release or satisfy a mortgage in whole, and consequently that power embraced the authority to make the release in part. Thus having the authority to act in the premises, the corporation, through its president, exercised the same, as will be seen by considering the foregoing facts and circumstances, together with the following.

Attention now must be given to appellant's mortgage containing the provision for future advancements to Salinger. Importance should be given at this juncture to Salinger's testimony:

"I suggested that something ought to be said about what

the bank was to do in consideration of the agreement that the paper should stand as security for such future indebtedness, and Mr. Hess and I then agreed, or rather he said that he would make whatever advances might be needed in the future in any way connected with handling the proposition and problem of this 750 acres of land; any money that might be needed to float that and improve it, and to take care of refinancing obligations that were liens against it. I am speaking of Mr. J. P. Hess. He was at that time the president of the Carroll County State Bank (appellant), and he is the one to whom I gave the mortgage.''

Beyond peradventure of a doubt, Hess at that time was acting for appellant bank with full authority, because the bank accepted the mortgage from Salinger and made advancements according to the written terms thereof. Refinancing obligations were contemplated by Salinger and the appellant Bank. Hess recognized that, and, acting for the bank, consented that this institution bear the burdens thereof. What refinancing obligations did the parties then have in mind? The Royal Union Mutual Life Insurance Company mortgages were in existence. Moreover, when Salinger executed the $75,000 mortgage to the Central Trust Company for the purpose of paying the Royal Union mortgages, additional incumbrances were placed upon the land by him. Two other mortgages were at that time executed to the Central Trust Company by Salinger, one for $780 and the other for $15,000. Each was subject to the superior $75,000 mortgage. These additional incumbrances there made necessary, it is said for the purpose of securing commissions and interest adjustments in procuring the Central Trust Company $75,000 loan. A recital in said $15,000 mortgage is to the following effect: ''Subject to first mortgages aggregating $75,000''. That aggregate included appellee's mortgage. Performing its obligation to make future advances and bear certain burdens in refinancing, as testified by Salinger, the appellant bank assisted him in purchasing from the Central Trust Company the aforesaid $15,000 mortgage for $12,000. Mr. Reynolds negotiated that transaction for Salinger and gave the Central Trust Company a check upon the appellant bank, which by it was cashed and charged to Salinger. Resulting from that transaction is a $12,000 note which Salinger owes the appellant bank.

Under those circumstances, it cannot be seriously questioned that the appellant bank not only knew of the application to the Central Trust Company for the $75,000 loan, but contemplated such loan as part of the refinancing for the Salinger obligations. Not only that, but in addition thereto, the appellant bank in confirmation thereof assisted Salinger in purchasing the aforesaid subsequent $15,000 mortgage from the Central Trust Company for $12,000 in order to reduce the incumbrances on the above-named land. There was no way for such $15,000 obligation to arise except through commissions and interest adjustments on the $75,000 loan procured from the Central Trust Company. Without such $75,000 loan, there would have been no $15,000 mortgage upon the Salinger lands. Signifying its knowledge and approval of such loan with the Central Trust Company, appellant adopted the $15,000 debt as a part of its refinancing obligations to Salinger, under its mortgage which provided for future advancements. Clearly, therefore, under the facts and circumstances revealed by the record, Mr. Hess, the president of the appellant bank, was not only authorized by the articles to execute releases and satisfactions, but also possessed sufficient power enabling him to make a release of the bank's mortgage a valid corporate act.

Following the first release, as before said, the bank, on May 2, 1924, executed the second release similar to the first except that the corporate seal was attached. Conceding, then, that the first release lacked an essential prerequisite for validity, nevertheless the second release under the circumstances confirmed a valid corporate act.

II. An argument is, made by appellant, however, that the foregoing conclusion cannot be reached because Hess, appellant's president, when called to the witness stand by appellee and examined as such witness, indicated that his authority as president was to release mortgages only which had been fully paid and in no event to execute a waiver of the kind in question without the sanction of the bank's directors. It is therefore insisted by appellant that the appellee is bound by the testimony of Mr. Hess, who was its witness. Consequently, appellant concludes that appellee in no event can contradict its witness and otherwise show that the president was empowered to ex-

ecute the waiver or release. Reliance here is made by appellant upon the following authorities:

"Such a witness cannot be impeached by the introduction of evidence tending to show that * * * (his) reputation for truth and veracity is not good." Gardner v. Connelly, 75 Iowa 205.

"The court instructed the jury, properly and correctly, that plaintiff, having made defendant her witness, vouched for the credibility and truthfulness of the witness, and that she might not claim him to be unworthy of belief." Wilson v. Prettyman, 195 Iowa 598.

Endicott Johnson Corporation v. Shapiro, 200 Iowa 843.

"* * * In calling (a man) * * * as a witness * * * (a party does) vouch for his general character as a man of truth and veracity * * *" Kelley v. Kelley, 189 Iowa 311.

For a similar holding see: Erusha v. Wisnewski, 207 Iowa 1187. This, however, does not mean that a party who calls a witness is "bound hand and foot" by the "evidence given". Such party may call another witness and show "a different state of facts". Gardner v. Connelly, (75 Iowa 205), supra.

"The rule is well settled in this state that a party calling a witness is not bound by his testimony, nor is he precluded from offering the testimony of other witnesses in contradiction thereof; * * *" Endicott Johnson Corporation v. Shapiro, (200 Iowa 843), supra, (local citation 846).

Consistent with the foregoing, we said in Wilson v. Prettyman, (195 Iowa 598), supra, reading on page 607:

"Of course, calling defendant as her witness did not preclude plaintiff from calling other witnesses to contradict him * * *. The jury might disregard the testimony of defendant on this matter, (the subject testified to by him), if there was any evidence or circumstance tending to show, or from which fair inference might be drawn, that defendant was mistaken in that about which he spoke."

So, too, in the case at bar, appellee could not impeach its witness but had the right to show that the evidence given by

the testifier was a mistake, and not according to the facts. There was the testimony of the witness Salinger, and facts and circumstances indicating that Mr. Hess, the president, was mistaken. Also Hess's testimony concerning his authority was in the nature of a conclusion based upon a mistaken idea of his power. Even on further examination, this same witness testified that he had released mortgages without express authority from the bank's board, and that he could recall no resolution of the board authorizing any officer to execute a similar waiver or release. No director or other person testified that the president did not have authority to bind the bank by executing for it the release or waiver before us. And, as before said, the many facts and circumstances disclosed by the record, suggest that the president at the time in question did possess full authority to act in the premises.

 III. Continuing its argument concerning the invalidity of the release, appellant urges that there is no consideration upon which the banking corporation could base such corporate act. Nothing in the way of money or property was received by the appellant bank at the time the releases were signed and delivered. On the other hand, appellant points out that the Royal Union mortgages first on the land, including principal and interest, amounted to approximately $56,000, while the new incumbrances originally contracted with the Central Trust Company aggregated $75,000. Therefore the prior incumbrance is increased.

Although the foregoing be true, it does not result that there was no consideration for the release agreement. Consideration which will support a contract may consist not only of gain to one contracting party, but also of a detriment or inconvenience to, or liability assumed by, another. Jewett Lumber Co. v. Conroy Co., 171 Iowa 513. See also: Heflen v. Brown, 208 Iowa 325; Lange v. Nissen, 208 Iowa 211. Benefit, however, did accrue to appellant under the circumstances because through the $75,000 new loan, foreclosure of the Royal Union mortgages was prevented. Had there been such foreclosure, appellant would have been required to pay the $56,000 Royal Union mortgages or lose its own second mortgage security. Not only that, but through the release or waiver, the Central Trust Company was persuaded to loan Salinger $75,000 on the land. Under

all the circumstances before related, it is apparent that the release was supported by a legal consideration.

Wherefore, the judgment and decree of the district court is affirmed.—Affirmed.

FAVILLE, C. J., and EVANS, MORLING, and GRIMM, JJ., concur.