In re ESTATE OF C. C. LINDSEY, deceased.
CLARENCE LINDSEY et al., appellees and cross-appellants, v. LEE LINDSEY et al., appellants.

No. 50788.

(Reported in 118 N.W.2d 598)

700

December 11, 1962.

Rehearing Denied January 15, 1963.

Cornwall, Cornwall & Avery, of Spencer, and Whitney, Whitney & Stern, of Storm Lake, for appellants.

Alan Loth, of Fort Dodge, for appellees and cross-appellants.

Moore, J.—This case involves the estate of C. C. Lindsey, who died May 12, 1961, leaving a last will and testament, dated April 26, 1951, wherein he devised and bequeathed his property to his daughter Dorothy and his twin sons, Leo and Lee, with provision Dorothy was to pay his daughter Rose Marie $1000. His remaining six children, Claude, Clarence, Alma, Harvey, Mavis and Berniece, were specifically disinherited. On May 16, 1961, the three devisees filed the will and offered it for probate. On June 15 and by amendment August 31 the other seven chil-

dren filed resistance to the probate of the will and made application for administration. They alleged an oral agreement had been entered into that the father's will would not be probated, the property would be treated as though he died intestate, and his ten children would share equally in it, except what might be used for his care during his lifetime. They claimed the agreement was made with Claude and Clarence on behalf of and for the benefit of all applicants. They claimed their part of the agreement had been performed. The three proponents filed answer denying the making of any oral agreement and claiming such an agreement would be invalid and unenforceable by reason of the statute of frauds. By stipulation the case was tried as in equity, with agreement the seven brothers and sisters should have no greater burden of proof than at law. The trial court held the evidence established an oral agreement for division of real property of about 400 acres in Pocahontas County and held the personal property belonged to the survivors named therein. The court held the validity of the will was not in issue, denied it to probate and appointed a special administrator.

Dorothy, Leo and Lee are appellants and claim (1) the evidence does not support the court's findings there was an oral agreement to divide the real estate, (2) evidence of such an oral agreement is barred by the statute of frauds, and (3) the court erred in denying the will to probate.

The other seven children are appellees. They have cross-appealed claiming personal property should have been ordered divided under the oral agreement.

Decedent and his wife were divorced in 1940. The three appellants remained with him. The seven appellees went with their mother and never had anything to do with their father thereafter. There were really two families. The children in the two families were like strangers until 1955 when Leo and Lee exchanged some farm work with Claude. When Leo returned from military service he immediately left his father's home and took a nearby house. Lee after military service returned to live with his father and Dorothy until October 1956 when he went to live alone. Leo and Lee moved because of difficulty with their father. A few days before Christmas 1956

the father attacked Dorothy. She escaped through a window with only the clothing she was wearing. Dorothy, Leo and Lee then discussed what action should be taken as the father was a sick man, unmarried and unable to care for himself. They knew the provisions of his will and were afraid their father might disinherit them. The three met with Claude in his home that night and again the next morning. The events which occurred at Claude's home and thereafter can best be determined from the evidence of the witnesses.

Claude testified regarding his first talk with Dorothy and the twins at his house shortly before Christmas 1956. He stated Dorothy said her father had threatened her life, she had crawled out a window to get away and the twins and she were afraid of their father; that they felt something should be done with the father and asked for his help. They told him the provisions of the father's will, stated it was not fair and asked him to go with them to see his attorney, Fred Gilchrist, about proceedings to have the father committed to an institution. The next morning Dorothy and the twins returned. They said if he would help them they felt the father's property should be divided among the ten children. They felt if they went ahead the father would be mad and disinherit them and for that reason they wanted him to help them.

Claude said that on December 24 he went to Gilchrist's office with Dorothy, Leo and Lee and gave the details of the conversation had by the parties with Attorney Gilchrist. That conversation will be set out hereinafter as related by Gilchrist.

Claude stated thereafter he went with Dorothy to see Alma, Mavis and Clarence. Dorothy explained to each of them the agreement that if help was given to take care of their father all should share equally in the estate at time of the father's death; that subsequent thereto Dorothy, Leo, Lee, Clarence and he visited Attorney Gilchrist where another extended conversation took place, the details of which will be set out in the testimony of Gilchrist.

He said an information against the father for a sanity commission hearing was later signed by Dorothy, Leo, Lee and himself and at the hearing all of the children were present except

Rose Marie and Berniece, at which time a conversation took place in the presence of the brothers and sisters, the details of which will be set out hereinafter in the testimony of Attorney Donald Beneke; that he acted as guardian, together with Mr. Beneke, of the property of his father until the father's death.

Part of the testimony of Mrs. Claude Lindsey set out in narrative form from the record as approved by counsel and certified by the court is:

"Until the things we are talking about here our family had nothing to do with his father or the twins. One night the twins brought Dorothy over to our house but I had already gone to bed, and I stayed there. Dorothy didn't stay with us that night. She came again next morning with the twins. They all had a talk with Claude while I was there. They said they were quite upset. They wanted their father taken care of and wondered if Claude would go with them and see what they could do to have him taken care of. They felt they needed the family as a group to help, and if the family as a group could go and help them take care of their father, that after he was no longer living, however he left his property, it would be divided amongst the ten children. Dorothy is the one who outlined that plan. All four of them were together. Neither of the twins said, 'We don't want to do that.' Lee said it was the fair way. Leo says, 'I can only answer for my tenth.'

"Dorothy stayed at our house that night and until about the first of April, all the rest of the winter. This was the first time Dorothy had been to see us. The twins had been coming off and on most of the past year, either to visit or set up chicken cages or to work.

"When Dorothy said the things I have told about, Claude said yes, he would help take care of his father, and agreed that was the proper way; that the estate should be used to take care of his father as long as he lived and that the fair way was that it should be divided.

"All four of them left our house together to go to Gilchrist's office."

Part of the testimony of Attorney Fred Gilchrist in narrative form from the record is:

"I recall December 24 when Claude and his two brothers and his sister Dorothy came to my office. They informed me—I don't recall whether it was Claude or Dorothy, but one or both of them informed me that their father had reached a stage where it was necessary that he be taken before the Sanity Commission. Dorothy said she had come to Claude for help because the situation was such with her father that if she, Lee and Leo would file information against their father, naturally he wouldn't like it and it would probably estrange their father from them. In any event he would contest the insanity. That Dorothy, Lee and Leo had informed Claude that if the other children and Claude would assist them in having their father committed and would sign the necessary papers, that they had agreed with Claude that, no matter what their father may have done with reference to disposing of his property before his death, they would upon the father's death divide the property equally between all ten children. They asked me the procedure before the Commission. I informed them an information must be filed in the clerk's office and advised them it was best to contact the county attorney and the clerk to arrange for the information and they could then sign it. I asked them who Mr. Lindsey's physician was. They said Dr. Gannon. I said we better talk with him about Mr. Lindsey's mental condition. So Claude and I did go to Dr. Gannon's office and discussed the matter with him there. No actual papers were made on December 24th.

"I believe it was the day after Christmas that I came to Pocahontas with Claude to discuss it with the county attorney. I believe there was another conference with Lee, Leo, Dorothy, Claude and Clarence on the morning of the 27th. The thing was discussed again. We had arranged by that time to have the hearing the next day. While they were all together in the office, this agreement was discussed again with Clarence. As I recall, it was Dorothy who did most of the talking and explained what the arrangement was to Clarence. She said about the same thing she had said a couple of days before; that they had to do something with the father, it was impossible to care for him on the farm; he would have to be committed. That she'd need their help to do it, and if they would do that, on their father's

death the property of the estate would be divided equally between all ten children. She very distinctly said that and I recall her saying that.

"All the available children were asked to be present at the hearing. Some of them couldn't be. All who could be called, or could be there, were asked to come to this hearing. I didn't do that personally.

"When Dorothy was describing this as I have told you, the twins sat there and heard the statement from Dorothy. They said very little, as I recall. There was no objection whatever on their part. * * * There was no dissent or disagreement expressed by anybody about this ten-way split at either time they were in my office."

Attorney Donald Beneke represented C. C. Lindsey at the sanity commission hearing. Part of his testimony in narrative form from the record is:

"Mr. Lindsey was very much concerned that the sanity hearing was a device by some of his children to get away with his money. I presented that feature to the commission. The children —the persons who were pressing the complaint—presented evidence of certain violence and other acts that Mr. Lindsey had committed. It ended up that the commission voted to commit him.

"We were around the clerk's office discussing this thing. I presented Mr. Lindsey's angle of it; the others presented theirs. I believe Mr. Gilchrist was there; the clerk was there and possibly some others who had to do with the hearing. I believe Claude made a remark that we had both said what we thought, but as far as he was concerned there was nothing personal in it. He said: 'Now you think we are after dad's money. That isn't so at all. I think you can see from what we have presented here that father belongs at Cherokee.' * * * Well, anyway, Claude said to me in effect 'We are not after father's money.' Dorothy was also there and she says: 'No, we are not, because we have agreed to divide everything up equally among us after father is gone, and we are not going to pay any attention to this will.'

"She knew he had a will. We had talked about that different

times. When that was said there, I was on one side of the counter; Claude and the other folks and Dorothy on the other side of the counter. As I recall that was about as far as we went into that particular phase, except they were trying to assure me they were not after the father's money. We had spoken frankly to each other, and were assuring each other there was nothing personal in it.

"When Dorothy made the statement about the agreement for the division, and not paying any attention to the will, the other people did not, as I recall, register any dissent or disapproval or disagreement in any way. Claude was the only one who made a comment, affirming what Dorothy had said. Nobody else said anything about that particular phase that I recall."

Clarence testified regarding the conversation at the office of Attorney Gilchrist and the conversation had among all of the children soon after the father's funeral.

Clarence, Mavis and Alma each testified Dorothy, prior to the sanity hearing, told them the details of the ten-way split agreement made with Claude. Those three and Harvey testified of their part taken in the sanity commission proceedings and of the conversation had when all ten children were present after the father's funeral. Each testified that at that conversation Dorothy admitted making the agreement, as did Leo, but that Lee would neither admit nor deny it but simply said he was going to follow his father's wishes as expressed in the will.

Rose Marie and Berniece were nonresidents of Iowa when the oral agreement was made. Each testified about conversation had after the father's funeral and admissions made by Dorothy and Leo as well as the statement made by Lee.

As witnesses, Dorothy, Leo and Lee each admitted the visits to Claude's home, to Gilchrist's office, to the homes of the brothers and sisters, their presence at the sanity commission hearing and the meeting of the ten children after the father's funeral, but categorically denied or said " 'I don't remember that' " when asked about statement made by Dorothy or any of them concerning the alleged oral agreement. Each denied the con-

versations concerning the oral agreement, related by Gilchrist and Beneke, ever took place.

I. This cause was tried in equity and is here triable de novo. Rule 334, R. C. P. Appellants argue several propositions in contending the trial court erred in finding the claimed oral agreement had been made. Appellees argue they need only to prove the oral agreement by a preponderance of the evidence. Appellants contend the proof must be by clear, satisfactory and convincing evidence. We agree with the trial court and find the evidence established the oral agreement by clear, satisfactory and convincing evidence. The question of appellants' burden of proof under the terms of the stipulation need not be resolved.

In equity cases, especially when considering the credibility of witnesses, the court gives weight to the fact findings of the trial court, but is not bound by them. Rule 344(f)7, R. C. P. There is nothing unreasonable or improbable about the claim made by appellees. Their testimony appears to have been frank, straightforward and strongly corroborated by that of Gilchrist and Beneke, while the testimony of appellants has no corroboration and carries no conviction of its truth on material matters.

Appellants contend the evidence fails to show the twins, Leo and Lee, agreed to the claimed oral contract. They argue the twins did not expressly consent to the arrangement. In Kladivo v. Melberg, 210 Iowa 306, 313, 227 N.W. 833, 837, it is said:

"The existence of a contract, 'meeting of the minds,' intention to assume an obligation, the understanding, are to be determined not alone from words used, but in the situation, acts, and conduct of the parties, and from their situation and the attending circumstances, and by the inferences which mankind would ordinarily and reasonably draw therefrom."

In In re Estate of Newson, 206 Iowa 514, 518, 219 N.W. 305, 307, it is said:

"Usually agreement is arrived at by means of a proposal or offer, express or implied, from one side, expressly or impliedly accepted on the other. But formality in proposing and accepting is not required. * * * The existence of the mutual understanding, the proposal and acceptance, may be implied

from conduct and circumstances. These may be shown by circumstantial evidence, or by the admission of the party to be charged."

See also Hankins v. Young, 174 Iowa 383, 156 N.W. 380; Snell v. S. S. Kresge Co., 223 Iowa 911, 274 N.W. 35; In re Estate of McKeon, 227 Iowa 1050, 289 N.W. 915, and citations.

Their conduct, participation and admissions, together with the circumstances shown, clearly prove Leo and Lee were parties to the agreement.

Appellants' claim of no consideration for the oral agreement is without merit. In the early case of Daily v. Minnick, 117 Iowa 563, 91 N.W. 913, 60 L. R. A. 840, it was held the privilege of naming a child is a valid and legal consideration for a promise to convey land to the child. In Bankers Trust Co. v. Economy Coal Co., 224 Iowa 36, 42, 276 N.W. 16, 20, it is said:

"A consideration consists of some benefit or advantage accruing to one party to a contract or some loss or disadvantage incurred by the other. In other words, any benefit to the person making the promise, or any loss, trouble, or inconvenience to, or charged upon, the person to whom it is made. This court has said in Homesteaders' Life Assn. v. Salinger, 212 Iowa 251, 264, 235 N.W. 485, 491, that:

" 'Consideration which will support a contract may consist not only of gain to one contracting party, but also of a detriment or inconvenience to, or liability assumed by, another.' "

See also St. Peter v. Pioneer Theatre Corp., 227 Iowa 1391, 291 N.W. 164, and citations.

In this case Claude performed his part of the bargain as requested by appellants including getting the assistance of the other appellees who were available. Consideration is amply proven by his performance.

Appellants vigorously argue no valid binding agreement could have been made because Rose Marie and Berniece were not aware of the alleged agreement until the time of their father's death. Appellants claim Rose Marie and Berniece were not parties to the agreement nor bound by it. One obvious answer to this contention is that the two sisters have adopted

the agreement and are parties in this case. A more compelling reason against their contention is the terms of the agreement. Appellants made the agreement with Claude for the benefit of the other appellees. We have held repeatedly a contract between two persons for the benefit of a third person is valid as to such beneficiary and enforceable by him. Meyer v. Stortenbecker, 184 Iowa 441, 165 N.W. 456; In re Estate of Walker, 234 Iowa 1126, 15 N.W.2d 260; In re Disinterment of Tow, 243 Iowa 695, 53 N.W.2d 283; Reeves v. Better Taste Popcorn Co., 246 Iowa 508, 66 N.W.2d 853; 12 Am. Jur., Contracts, section 288.

In In re Disinterment of Tow, supra, at pages 698, 699 of 243 Iowa, page 285 of 53 N.W.2d, it is said:

"One for whose benefit a contract is entered into may maintain action to enforce his rights under it. Venz v. State Auto. Ins. Assn., 217 Iowa 662, 666, 251 N.W. 27. The rule is unquestioned in this state. It is unnecessary that the beneficiary assent to the contract or even that he have knowledge of it. Rodgers v. Reinking, 205 Iowa 1311, 1319, 217 N.W. 441."

II. Counsel and the trial court assumed the oral agreement is for the creation or transfer of an interest in land. We approach the second proposition raised by appellants with the same assumption.

We quote the pertinent part of the statutes from Iowa Code, 1958, 1962, section 622.32:

"Statute of Frauds. Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * *

"3. Those for the creation or transfer of any interest in lands * * *."

Section 622.33: "Exception. The provisions of subsection 3 of section 622.32 do not apply where the purchase money, or any portion thereof, has been received by the vendor * * * or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds."

Our statute does not forbid oral contracts or render them invalid. It relates merely to the manner of proof. Berry-

hill v. Jones, 35 Iowa 335; McMinimee v. McMinimee, 238 Iowa 1286, 30 N.W.2d 106; Miller v. Lawlor, 245 Iowa 1144, 66 N.W.2d 267, 48 A. L. R.2d 1058. Proof of an oral agreement is permitted under the circumstances enumerated in Code section 622.33.

Payment of "purchase price" as described in the exception is usually spoken of as "part performance". It has been a long-recognized rule of this court that any conduct, acts or circumstances offered to show "part performance" in order to bring a case within the exception of the statute of frauds must be referable exclusively and unequivocally to the contract. Sweeney v. O'Hora, 43 Iowa 34; Fairall v. Arnold, 226 Iowa 977, 285 N.W. 664; In re Estate of McKeon, 227 Iowa 1050, 289 N.W. 915; In re Estate of Karr, 235 Iowa 351, 16 N.W.2d 634; Vanston v. Rupe, 244 Iowa 609, 57 N.W.2d 546.

In our judgment the evidence is clear, satisfactory and convincing that services performed and acts done by Claude were in accordance with the proposal made by the appellants. He was induced to act by their proposal and performed in accordance therewith. We agree with the trial court. The evidence was admissible under the exception to the statute.

III. The validity of decedent's will was not questioned. The decree states:

"2. That decedent's will be, and it is hereby, denied probate, pursuant to the oral agreement made among his heirs at law to divide the estate in ten equal shares regardless of his will."

Appellants argue the will should have been admitted. To order and change the decree would not give them more than the present decree provides. Assuming, without deciding, the will should have been admitted to probate, no prejudice resulted. It would serve no useful purpose to order a change of the decree. The result is right on its merits.

IV. In their cross-appeal appellees argue certain personal property held by the guardians should be included in the ten-way division as property of decedent at his death. The trial court found the evidence failed to disclose decedent's funds purchased the securities or furnished the funds in the joint accounts.

The court then ordered the joint United States securities and investment accounts be delivered by the administrator to the survivors named thereon, in accordance with the respective written agreements and contracts, which are a part of said instruments and accounts, to be theirs absolutely. We agree with the trial court's findings and order.

It is our judgment the record amply sustains the findings and decree of the trial court. This case is affirmed on both appeals.—*Affirmed.*

All JUSTICES concur.