Curtis DAVIS, Appellant,

v.

W. E. DAVIS, Appellee.

No. 52631.

Supreme Court of Iowa.

March 5, 1968.

Life, Davis & Life, Oskaloosa, for appellant.

Johnson & Jordan, Knoxville, for appellee.

MASON, Justice.

This is an equitable action to enforce an alleged 1953 oral agreement that if plaintiff, Curtis Davis, 42, would contribute his work as a farmer and assist his defendant father, W. E. Davis, 72, in paying all defendant's debts he would make a will giving plaintiff half his estate. Plaintiff alleged defendant had made such a will but cancelled it and made other wills in violation of the contract. Plaintiff seeks to restrain his father from making a will contrary to the alleged oral contract.

At the conclusion of the evidence the trial court stated plaintiff had failed to carry the burden to prove the terms and provisions of the contract or that there was such part

performance as to remove the bar of the statute of frauds.

Plaintiff contends he agreed to and did convey a life estate in one farm to his father, remain upon and operate the father's other farm and thereby help pay some indebtedness.

In answer defendant asserted no such agreement was entered into, the alleged contract is within the statute of frauds and is too vague and indefinite to constitute an enforceable contract.

The court found plaintiff did work defendant's farms but as a tenant sharing the income—a customary stock and grain share lease arrangement, and a transfer by plaintiff and his wife of a life estate in a tract of land was part of a settlement of the divorce action filed by defendant's wife, plaintiff's mother, wherein defendant agreed to transfer his interest in this farm with the understanding plaintiff and his wife would reconvey to him a life interest therein, and not in part performance of the alleged oral contract.

I. From the decree dismissing plaintiff's petition he appeals, assigning as propositions for reversal error in (1) holding plaintiff had failed to prove the oral contract by clear and convincing evidence, (2) holding plaintiff had failed to remove the oral contract from the statute of frauds by part performance, (3) finding that exhibit 3, a reconveyance of the life estate to defendant, was not part performance of an alleged oral contract, (4) not giving consideration and effect to all exhibits supporting the oral contract showing part performance thereof by plaintiff and (5) refusing to permit plaintiff to introduce as rebuttal the evidence of H. E. deReus.

II. Defendant W. E. Davis and his first wife, Maude, were divorced May 11, 1953. This marriage had produced two sons, W. E. Davis, Jr., and plaintiff, and six daughters. W. E. Davis, Jr., died in 1942 leaving no wife or children. After the divorce W. E. Davis married Lucille Davis who remains his wife. They have one son, Walter Howard Davis, usually called Howard.

■ Plaintiff intervened in the divorce action, claiming an interest in the farmland of his parents based on an alleged oral agreement in 1940 between him and his brother, W. E. Davis, Jr., on the one hand and their parents, W. E. and Maude Davis on the other, that if the boys stayed on the farm and helped the parents get out of debt the boys would get "what the parents had when they were done." This procedure is permissible. In Wharff v. Wharff, 244 Iowa 496, 501, 56 N.W.2d 1, 4, we said: "Where property rights are involved in divorce proceedings, it is generally held, * * *, that a third person, whose interests may be adversely affected may intervene * * *." Citing 27 C.J.S. Divorce § 91.

In 1940, the date of this alleged agreement, plaintiff was 16, had two years of high school left and W. E., Jr., was 20. Both boys stayed on the farm until 1942 when W. E., Jr., died. Plaintiff remained on the farm, graduated from high school in 1942 and married in 1947. Thereafter he continued to live with his wife in one of the two sets of buildings on the farm.

At the time the divorce action was pending defendant owned approximately 745 acres of farmland in Marion County, all in his name except 147 acres owned by defendant and his then wife Maude as tenants in common, and except the "Wallace Farm" of 137 acres (part of the 745 acres) which was of record in the names of Curtis Davis and Walter Howard Davis as tenants in common. In addition defendant and Maude owned as tenants in common a 240-acre farm in Monroe County commonly called the "May Place." All the land was then unencumbered. Defendant had purchased the "Wallace Farm" of 137 acres from his son-in-law prior to the divorce and had received a deed running to W. E. Davis. Before the deed was recorded defendant decided to put the land in Curtis'

name, and with the latter's assistance deleted the "W. E." and inserted "Curtis" in the deed. Apparently the name Walter Howard Davis was also added as a co-grantee before the deed was recorded. In 1957 defendant quieted title in himself to this 137-acre farm against his sons Curtis and Howard, without contest.

In the divorce action there was difficulty in effecting a property settlement. In general, Curtis was aligned with his father and the daughters with their mother in the divorce action. After it had been pending over a year plaintiff worked out a proposition of settlement with his mother which his father approved, it was embodied in written stipulation and the divorce obtained.

The stipulation provided in substance that Curtis should get the 240-acre "May Farm", except for life estates in the mineral rights reserved to W. E. and Maude; defendant should have the 745-acre farm; Curtis should pay his mother and father $1500 each on or before December 1, 1953, evidenced by his promissory notes; and defendant should pay Maude $10,000 cash, execute and deliver to her his promissory note for $14,420 payable in five years, with 5 percent interest, secured by a mortgage on defendant's real estate.

Following the stipulation of May 8, 1953, defendant decided that instead of executing a note and mortgage to Maude for $14,420 as provided in the stipulation, he would borrow money from a Knoxville bank and pay Maude off in full following the divorce and this was done. At this time Curtis executed and delivered to each of his parents his promissory note for $1500 as called for in the stipulation. Curtis paid his note to his mother but the note to his father was never paid. It was not a part of the sum defendant paid Maude.

In the property settlement of the divorce action Maude executed and delivered to defendant a deed of any interest she might have in the 745-acre Marion County farm; defendant and Maude Davis executed a

deed to plaintiff conveying the 240-acre Monroe County farm, reserving a life estate in the minerals; and plaintiff and his wife executed and delivered to defendant a deed for a life estate in this Monroe County farm. This latter exchange was made May 12, 1953, in the office of H. E. deReus, Curtis' attorney, in the presence of Mr. deReus, Curtis, defendant and defendant's attorney. Maude Davis was not present or aware that Curtis and his wife were conveying this farm back to defendant for life and there was no reference to the reconveyance in the divorce stipulation.

III. Plaintiff contends the 240-acre "May Place" was conveyed to him in settlement of the alleged 1940 agreement with his parents but does not explain why he executed and later paid the promissory note to his mother. His explanation of the $1500 note to his father was, "He told me that this note would help him out, he would give it 'to me if I would help him out." Plaintiff further contends conveyance of the life estate to W. E. Davis was not part of the divorce settlement but based on a new agreement made in Mr. deReus' office when "my father told me if I would give him a life estate in the 240 acres and stay on that big farm in Marysville [the Marion County farm] and farm it and help him get out of debt one more time I would get half of what he had when he was through." Plaintiff testified he accepted this proposition by his father. It was not reduced to writing. Plaintiff does not contend there had been any discussion of the matter before going to deReus' office.

Defendant, on the other hand, contends there was no such agreement in 1940; the reason Curtis intervened in the divorce action was because the rest of the relatives were "making a grab" so he might just as well "make a grab," too, and defendant agreed with him. Some six months after Maude commenced the divorce a number of defendant's relatives sued him for $75,000. The case was tried and decided favorably to defendant. The basis of the suit does not appear in the record. Defendant's ex-

planation for Curtis' giving the two $1500 notes was that originally Curtis wanted the 137-acre "Wallace Farm" but changed his mind and wanted the "May Place" instead, figured it was worth $3000 more, so he agreed to pay each of his parents $1500. As a result of the trade Curtis did not defend against defendant's 1957 quieting title action to the 137-acre "Wallace Farm."

Defendant further contends the reconveyance to him of a life estate in the Monroe County farm was a part of the package presented to him by Curtis in the divorce settlement. He testified he wanted the income of approximately $4000 from this farm.

Both parties agree plaintiff remained and worked on the farm after his father's divorce until March 1, 1966, three months after this action was commenced. Plaintiff contends he stayed pursuant to the alleged oral agreement. Defendant says plaintiff stayed as a tenant or partner in a livestock farming operation on a 50-50 basis and received his full half of the income each year from and including 1953. Plaintiff admits he received the income every year except 1953, when he says he received only farm expenses, food and clothing out of $12,000 income.

To secure the loan from the Knoxville bank defendant gave a chattel mortgage covering livestock, machinery and grain. Curtis owned an interest in most of this property and at the banker's request he and his wife joined in the mortgage. Over a period of about 18 months ending November 10, 1954, defendant paid off this note. Curtis admits he paid no interest or principal on this indebtedness but contends he did the bailing and combining for a few years without charging his father and, therefore, helped indirectly. While the divorce action was pending defendant was being audited on his 1951 federal income tax return. An assessment had been made which was settled by defendant's paying $3092.94 in 1954 or 1955. Curtis concedes he did not share in paying this indebtedness.

IV. It is our duty to consider this appeal de novo. Rule 334, Rules of Civil Procedure.

As indicated, plaintiff's action is based on an alleged oral contract pleaded in paragraph 1 of his petition stating in substance that during 1953, the exact date not being known to him, an oral agreement was made whereby plaintiff agreed to work "with defendant and render his services as a farmer to the achievement of a common purpose of plaintiff and defendant, * * * the payment of debts * * * owed by defendant," and defendant agreed to make a will giving plaintiff half interest in both 745 acres of land and all personal property owned by defendant at his death.

V. As plaintiff concedes, he had the burden to prove by clear and satisfactory evidence the terms of the contract declared upon in his pleadings. Sawyer v. Sawyer, Iowa, 152 N.W.2d 605, 609; James v. James, 252 Iowa 326, 329, 105 N.W.2d 498, 500; and In re Estate of Lenders, 247 Iowa 1205, 1213, 78 N.W.2d 536, 541, and authorities cited in these cases. Upon this appeal it may therefore be assumed such is the requisite quality of proof. This requirement of a more exacting measure of persuasion in Iowa is limited to cases in equity and generally does not apply where a question of fact in a law action tried to a jury or to the court without a jury is to be determined by but one quantum of proof and that is by a preponderance of the evidence. Lungren v. Lamoni Provision Co., Inc., 248 Iowa 887, 898, 82 N.W.2d 749, 755; Carlson v. Bankers Trust Co., 242 Iowa 1207, 1214, 50 N.W.2d 1, 6; Roth v. Headlee, 238 Iowa 1340, 1343, 29 N.W.2d 923, 924, and citations; Provident Mutual Life Insurance Co. of Philadelphia v. Bennett (N.D. Iowa C.D.), 58 F.Supp. 72, 78; and Crandall v. Bankers Life Co., 245 Iowa 540, 549–550, 62 N.W.2d 169, 174.

We disagree with plaintiff's contention he has established the existence of an oral agreement with the degree of proof required in this equitable action.

Plaintiff started the introduction of his evidence by calling defendant as an adverse witness. Plaintiff also testified and the only other witnesses were his wife, Frieda, and his mother. Neither gave any testimony as to the making of the alleged agreement. Neither of the attorneys present at the May 12 meeting in deReus' office was called. More about this later.

To corroborate his own testimony that an oral agreement was in fact made, one of the matters plaintiff relies upon is defendant's execution of a will in June 1953, one month after the May 12 meeting in deReus' office.

■ "A will made in conformity with an alleged contract is strong confirmatory proof that such an agreement was entered into; where there is evidence tending to show the existence of a contract, the proof of the exectuion of a will in favor of the promisee is corroborative proof of the contract, even though the will is invalid and even where the will is subsequently revoked, it is considered by the court as evidence in support of the agreement, but the subsequent execution of another will, not in conformity with the alleged contract, is strong evidence of the absence of such an agreement." 94 C.J.S. Wills § 113(2).

Here defendant's first will after his divorce from Maude was executed in June 1953, the exact date not being shown in the record. An unsigned office carbon copy identified as exhibit 8 was produced by defendant's attorney. By the terms of this will defendant gave the whole interest in over 240 acres of the 745-acre Marion County farm, a half interest in his remaining real estate plus 60 percent in value of all his personal property in trust for his son Howard. He gave the remainder of his real estate and the remaining 40 percent in value of his personal property to plaintiff.

In our opinion defendant's execution of the original of exhibit 8 does not tend to support plaintiff's position. In his pleadings and testimony he asserts the agreement was that he was to have half of defendant's property at his father's death. This will gives him considerably less.

In addition to the June 1953 will, the reconveyance of the life estate to his father as evidenced by exhibit 3 and the execution of the $1500 notes, other matters relied on as corroborating plaintiff's testimony include the signing by him and his wife of the chattel mortgage as security for the bank loan, his continued operation of the 745-acre farm and the fact his father did get out of debt.

Planitiff asserts nothing had been said in deReus' office about making a chattel mortgage. He testified his father had arranged for the loan at the bank; after they left deReus' office his father told him a bank officer wanted to see him and his wife, and they went to the bank and executed the mortgage. It is conceded plaintiff had an interest in property covered by the mortgage.

Plaintiff contends the signing of the chattel mortgage tends to prove the existence of the alleged oral agreement. Although not inconsistent with the alleged oral agreement, we do not believe it is proof of it. It certainly was not part of the agreement claimed to have been made in deReus' office upon which plaintiff bases this suit. He does not claim to have agreed to pledge his own assets to secure his father's indebtedness or to assist in shifting indebtedness from Maude to the bank. It must be remembered defendant could have complied with the divorce stipulation by giving Maude a note and mortgage.

Although the chattel mortgage and the bank ledger sheet indicate the loan was for $12,500, plaintiff testified it was for $27,500, all or a portion of which went to his mother. The record does not support plaintiff's contention as to the amount of the bank loan.

It is true defendant did get out of debt. As stated, he made the final payment on the bank loan November 10, 1954 and paid his

tax liability of approximately $3100 in 1954 or 1955. During this period defendant had substantial income from the Monroe County farm operated on a 50-50 basis on both livestock and crops. Royalties from coal mined on the two farms were substantial and, in addition, there was his share of the income from the 745-acre farm where he and Curtis raised 300–400 hogs a year as well as cattle. There is no evidence of any other indebtedness of defendant at the time of the alleged oral agreement.

We do not believe the fact defendant did get out of debt is proof of the alleged oral agreement.

Curtis continued to farm the Monroe County farm after his father and mother were divorced. Although he moved from the farm March 1, 1966, he returned later that spring at the suggestion of his sister. He testified, "There is no agreement yet as to farming the land. I am farming 50-50 like it has always been." His father admits that Curtis has been of help in the operation of the farm but points out that from 1953 to the time of trial Curtis received real estate, livestock, machinery and grain valued at about $140,000, not an unprofitable operation for him.

We have only the direct testimony of the two parties, plaintiff saying the agreement was made and defendant saying it was not.

■ A court cannot enforce a contract unless it can determine what it is. In order to be binding, an agreement must be definite and certain as to its terms to enable the court to give it an exact meaning. Although vagueness, indefiniteness and uncertainty are matters of degree, their existence as to any of the essential terms of an agreement is adequate reason for refusal to direct specific performance. In support see Decker v. Juzwik, 255 Iowa 358, 368–372, 121 N.W.2d 652, 657–660; 1 Corbin on Contracts, section 95; 1 Williston on Contracts, Third Ed., (Jaeger) section 37; and 17 Am.Jur.2d Contracts, section 75.

Plaintiff's evidence leaves too much to speculation, particularly as to what his obligations were under the terms of the alleged agreement to hold he had established an enforceable contract by the required quality of evidence.

■ VI. The performance plaintiff contends defendant promised required an act that would create or transfer an interest in land. The statute of frauds applies.

We quote the pertinent part of Iowa Codes, 1962, 1966, section 622.32:

"Statute of frauds. Except when otherwise specifically provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * *

"3. Those for the creation or transfer of any interest in lands * * *."

Section 622.33: "Exception. The provisions of subsection 3 of section 622.32 do not apply where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds."

Plaintiff concedes the statute is applicable but contends he successfully removed the bar thereof by part performance.

■ "The true basis of the doctrine of part performance, according to the overwhelming weight of authority, lies in the principles of equitable estoppel and fraud; it would be a fraud upon the plaintiff if the defendant were permitted to escape performance of his part of the oral agreement after he has permitted the plaintiff to perform in reliance upon the agreement" (Citing cases). Fairall v. Arnold, 226 Iowa 977, 986, 285 N.W.2d 664, 669, quoting from annotation in 101 A.L.R. 935.

"It has been a long-recognized rule of this court that any conduct, acts, or circumstances offered to show 'part performance' in order to bring a case within the exception of the statute of frauds must be referable exclusively and unequivocally to the contract" (Citing cases). In re Estate of Lindsey, 254 Iowa 699, 711, 118 N.W. 2d 598, 605.

Although the various acts relied upon by plaintiff are not necessarily inconsistent with his contention that an oral contract existed, we believe that taken separately or collectively they admit of explanation without reference to the alleged oral contract.

"To establish a contract indirectly and by extrinsic acts or circumstances it should fairly and definitely appear that these acts or circumstances were pursuant to the contract, or in performance thereof in whole or in part, or otherwise referable thereto. It has been a long-recognized rule of this court that any conduct, acts or circumstances offered to show 'part performance' in order to bring a case within the exceptions to the Statute of Frauds * * * must be referable exclusively and unequivocally to the contract, and if they admit of explanation without reference to the contract, they do not constitute part performance" (Citing cases). In re Estate of Karr, 235 Iowa 351, 368, 16 N.W.2d 634, 642.

" * * * But this does not mean that there should be an entire absence of conflict in the testimony. If this were so, the party against whom specific performance is sought could almost always defeat the plaintiff by setting up some other contract, to which the acts of part performance might be referred, and by producing some evidence, * * * to support such contract." Sweeney v. O'Hora, 43 Iowa 34, 37. Cited in Peddicord v. Peddicord, 242 Iowa 555, 559–560, 47 N.W.2d 264, 267.

"Our statute does not forbid oral contracts or render them invalid. It relates merely to the manner of proof." In re Estate of Lindsey, supra, 254 Iowa at 710–711, 118 N.W.2d at 605, and citations.

We agree with the trial court's findings the transfer of the life estate from plaintiff and his wife to defendant was in fact a part of the settlement in the divorce action; that plaintiff has not proven any facts fairly and reasonably accounted for in no other way than by the existence of this alleged oral agreement, and plaintiff thus failed to remove the case from the statute of frauds.

VII. What we have said in Divisions V and VI, supra, disposes of plaintiff's first four propositions.

VIII. Under his remaining proposition plaintiff argues the trial court's refusal to hear the evidence of H. E. deReus, his attorney at the time of the alleged oral agreement, was arbitrary.

During his case in chief plaintiff's counsel announced he would like to call deReus as his witness; he requested defendant's counsel to go with him to deReus' home to determine if he was able to testify; counsel expressed agreement and the court announced "if Mr. deReus isn't able to get up here we could go down there and take his testimony." After plaintiff rested, counsel was permitted to make this statement in the record:

"Yesterday I stated it was the desire of the plaintiff to take the testimony of Mr. deReus. Last evening Mr. Johnson and I went to the home of Mr. deReus and there in the presence of all of us we, interviewed Mr. deReus who has been ill something like three or four years. He stated that by virtue of his infirmities his mind was very hazy and he did not feel that in his present state he should testify in this matter; that some of it would be merely his hazy memory of which he would not be certain. Am I correct, Mr. Johnson?

"Mr. Johnson: Yes; that's correct."

It would appear plaintiff's counsel announced of his own choice he was not calling Mr. deReus as a witness.

However, after the close of defendant's evidence plaintiff's counsel announced that as a product of defendant's testimony given that morning, plaintiff desired to take as rebuttal just one phase of testimony from Mr. deReus as to whether he remembered defendant, plaintiff and defendant's counsel being in his office. Defendant's counsel offered to stipulate that on at least one occasion the four people mentioned were in deReus' office but refused to stipulate the exact date.

The court observed defendant had admitted in his testimony he was probably there and in view of the stipulation the parties were there on one occasion the court deemed the matter was not sufficiently material to grant the request.

Plaintiff's contention this ruling was an abuse of discretion is without merit.

Finding the propositions relied upon by plaintiff for reversal are without merit, the cause is

Affirmed.

All Justices concur.